**KNAUF FIBER GLASS, GmbH, Appellant,**

v.

**Sidney STEIN, Trustee of Ashcraft Trucking, Inc., and Neil Shook, Trustee of Glyn Ashcraft and Carolyn Ashcraft, Appellees.**

**No. 03A05–9103–CV–80.**

Court of Appeals of Indiana, Fifth District.

June 8, 1993.

---

Robert T. Thopy, McNeely, Sanders, Stephenson & Thopy, Shelbyville, Michael R. Fruehwald, Barnes & Thornburg, Indianap-

olis, Patrick W. Harrison, Beck & Harrison, Columbus, for appellant.

Robert A. Garelick, Steven M. Crell, S. James Fishman, Mantel, Cohen, Garelick, Reiswerg & Fishman, Indianapolis, Richard S. Eynon, Richard S. Eynon, P.C., Barbara Stevens, Barbara Stevens, P.C., Columbus, for appellees.

## STATEMENT OF THE CASE

RUCKER, Judge.

When Ashcraft Trucking Company and its owner Glyn Ashcraft went bankrupt in 1985, the Trustees in bankruptcy sued Knauf Fiber Glass Corporation. According to the Trustees, Glyn's business and personal bankruptcies were the result of promises Knauf made but did not keep. There were four theories of liability: breach of contract, promissory estoppel, fraud, and constructive fraud. After a lengthy trial, the jury returned a verdict in favor of the Trucking Company Trustee in the amount of $2,027,000.00 and in favor of Glyn Ashcraft's Trustee in the amount of $1,722,-000.00. Knauf Fiber Glass now appeals. The following rephrased issues are presented for our review:

1) Did the trial court err in denying Knauf Fiber Glass's motion for judgment on the evidence?

2) Was the evidence sufficient to support a judgment in favor of Glyn Ashcraft's Trustee?

3) Did the trial court err in instructing the jury?

4) Did the trial court err in admitting certain testimony over Knauf Fiber Glass's objection?

5) Were the damage awards excessive?

We affirm in part, reverse in part, and remand.

## BACKGROUND

The Ashcraft Trucking Company, located in Shelbyville, Indiana, began operations in 1970. Glyn Ashcraft was at all times its president and sole shareholder. The Company's initial fleet consisted of four or five operating tractors and twelve to fourteen trailers. During its first years in business,

Ashcraft Trucking's best customer was CertainTeed, a Shelbyville fiberglass manufacturing plant. Ashcraft Trucking was essentially the only trucking company used by CertainTeed to haul its fiberglass. In early 1978, CertainTeed was sold to Knauf Fiber Glass, (KFG) a corporate entity organized under the laws of Germany and formed for the purpose of operating the fiberglass factory. At that time Theis Knauf was president of KFG.

In 1979, KFG expanded its production, and Theis Knauf asked Glyn Ashcraft if he were interested in hauling additional fiberglass. Glyn expressed interest in the proposition, but informed Theis that Ashcraft Trucking would have to purchase thirty additional tractors in order to participate in the increased business. Glyn indicated it would be difficult to obtain additional financing and he expressed concern that the resulting obligation might eventually force him out of business. Theis agreed to assist in obtaining the necessary financing and told Glyn that if the trucks were acquired and the fiberglass hauled, then KFG would insure that Ashcraft Trucking would not go out of business.

Ashcraft Trucking obtained financing for the new trucks through the White Motor Credit Corporation and was able to do so because a) Glyn executed a personal guaranty, b) KFG prepared a letter indicating it would commit 50% of its outbound loads to Ashcraft Trucking for the year 1979, and c) KFG entered into an escrow agreement with White Motor Credit Corporation which provided, among other things, that if goods were shipped, amounts which became due to Ashcraft Trucking would be paid into an escrow account to be applied to the loan. Ashcraft purchased the new trucks, hauled the additional loads of fiberglass for KFG, and the financial condition of Ashcraft Trucking improved dramatically.

Between 1979 and 1983, Ashcraft Trucking and KFG developed a close and interlocking business relationship. At trial, a witness for KFG described Ashcraft as KFG's "private fleet." *Record* at 7585. KFG's traffic manager testified that KFG's relationship with Ashcraft Trucking was

different than KFG's relationship with any other carrier. *Record* at 6984–85. A witness for Ashcraft Trucking testified that in all of his years as a consultant in the transportation industry, he had never seen such a close and special relationship between a shipper and a carrier as the one that existed between Ashcraft Trucking and KFG. *Record* at 5824, 6032.

On April 20, 1983, KFG sent a letter to Ashcraft Trucking notifying it of a new machine KFG was starting up known as the "602 line." There had been several conversations concerning the machine over the previous year. The machine was anticipated to double KFG's shipping volume from 35 to 70 truckloads per day and was expected to perform at full capacity within 30 days. The notice invited Ashcraft Trucking to reply by April 27 and indicated that if Ashcraft Trucking were interested in the additional business then KFG proposed to split the added volume equally between Ashcraft Trucking and another trucking firm. *Record* at 5007–08. At that time Ashcraft was hauling approximately 330 truckloads per month for KFG, the trucks purchased in 1979 were nearly paid off, and Ashcraft was a highly profitable business.

In response to the notice Glyn Ashcraft sent a letter to KFG on April 26, indicating that in order to handle the increased delivery, Ashcraft Trucking would need an additional 30–35 tractors and 50 trailers. *Record* at 3234, 3243. This letter was followed up by weekly conversations between Glyn and representatives of KFG discussing the role of Ashcraft Trucking in the increased production due to the 602 line. During these weekly sessions KFG voiced its expectation that production would double with the introduction of the new line. KFG indicated the line had the capacity to produce six million pounds of fiberglass per month. Based on his long experience in the fiberglass industry, Glyn expressed reservations that a machine could produce that much insulation. *Record* at 3247. He was also greatly concerned over the amount of debt his company would incur if it purchased additional tractors to handle the increased business. *Record* at 3259.

During the conversations with KFG, Glyn questioned what would happen if Ashcraft Trucking decided not to participate in the additional business and instead continue to haul the current 330 loads per month. Harold Walters, KFG's director of customer services responded, Ashcraft Trucking had no option. Rather, it would probably get nothing because KFG was looking for a primary carrier to make a commitment to handle whatever KFG decided to give them. *Record* at 3260.

Thereafter, Glyn contacted White Motor Credit Corporation to discuss financing for 45 new tractors at a cost of $2,600,000.00. The terms required by the finance company for the proposed loan were basically the same as those for the 1979 loan. On August 17, 1983, Ashcraft Trucking ordered the tractors, but at that point was not bound to complete the purchase.

On August 26, 1983, KFG began operating the 602 line at the Shelbyville Plant. In mid-September Glyn Ashcraft was given a tour of the plant. He observed the size of the machine, nearly two hundred feet wide and a city block long, the amount of insulation the machine was producing, and the eight to ten people wrapping and bagging insulation as it came off the machine. Glyn was impressed and testified that KFG's director of customer services informed him that the machine was operating at full capacity and everything was sold. *Record* at 3250–51. On September 15, 1983, representatives of the White Motor Credit Corporation, Ashcraft Trucking Company, and KFG met to discuss the prospects of future business between Ashcraft Trucking and KFG. Representatives of KFG confirmed previous statements about the 602 line's capacity of six million pounds per month and the expected doubling of Ashcraft Trucking business to between 600 and 700 loads per month. *Record* at 3282. The Credit Company representative requested that KFG send a letter of commitment. KFG complied and sent a letter to Knauf Trucking, dated September 30, 1983. The letter indicated that because of increased production capacity, Ashcraft should conservatively average 100 loads

per week in 1984 resulting in an annual revenue of 4.5 million dollars. *Record* at 3289.

Thereafter, on October 19, 1983, KFG sent a letter to Ashcraft Trucking which read in pertinent part:

Now that we have had a chance to "test the water" with the products produced on the new machine, we are in a position to make a commitment to our primary carriers.

\* \* \* \* \* \*

Knauf Fiber Glass would like Ashcraft Trucking to be in a position to handle an average of 455 loads per month. The seasonable effect could result in a low of 410 and a high of 500.

Our commitment is of course contingent on your company remaining competitive with both rate and service.

\* \* \* \* \* \*

If for any reason you cannot or prefer not to accept the additional volume, please advise us promptly so we can make arrangements with other carriers.

*Record* at 3295. In November, 1983, White Motor Credit Corporation approved the loan to Ashcraft Trucking in the amount of $2,600,000.00. Glyn Ashcraft signed a personal guaranty, the 1979 escrow agreement was amended to reflect the new obligation, and Ashcraft Trucking purchased 45 new trucks and 50 new trailers.

However, after taking possession of the new tractors and trailers, Ashcraft Trucking's business with KFG did not increase. Rather, it decreased to a little over 200 loads per month. *Record* at 3363. Glyn Ashcraft was informed by Harold Waters that although KFG had the capacity to increase business to Ashcraft Trucking to 455 loads per month, KFG decided to distribute available loads among three or four other carriers. *Record* at 3405. KFG production records for the months of September and October, 1983, reveal that the 602 line was producing at only half of its capacity and never produced six million pounds

of fiber glass per month until 1985. *Record* 5422–26.

Despite efforts to replace the reduced KFG business, Ashcraft Trucking sustained heavy economic losses. In January, 1985, the Company filed for Chapter 11 reorganization, and the case was later converted to a Chapter 7 liquidation. Thereafter, creditors of Ashcraft Trucking sued Glyn Ashcraft on the personal guarantees and he and his wife Carolyn Ashcraft filed a joint petition for bankruptcy in July, 1985.[1]

Sidney Stein was appointed as Trustee over the bankruptcy estate of Ashcraft Trucking Company and Neil Shook was appointed as Trustee over the bankruptcy estate of Glyn Ashcraft. As successors in interest, the Trustees in bankruptcy filed this civil action against KFG on theories of breach of contract, promissory estoppel, fraud and constructive fraud. After a trial, the jury returned a verdict in favor of Sidney Stein in the amount of $2,027,000.00 and in favor of Neil Shook in the amount of $1,722,000.00. KFG now appeals. Additional facts are recited below where relevant.

### DISCUSSION AND DECISION

#### I.

KFG first contends the trial court erred in denying its motion for judgment on the evidence as against both plaintiffs on each of the four theories submitted to the jury.

■ Judgment on the evidence may properly be granted only when there is no evidence on one or more of the essential elements of the plaintiff's cause of action, or the evidence with respect thereto is without conflict and leads only to inferences in favor of the moving party. Ind.Trial Rule 50(A); *Montgomery Ward & Co. v. Gregg* (1990), Ind.App., 554 N.E.2d 1145, *trans. denied.* The trial court may consider only the evidence and reasonable inferences most favorable to the non-moving party. If there is any evidence of proba-

---

1. The claim made by Carolyn Ashcraft was dismissed prior to trial and therefore she is not a party to this appeal.

tive value or reasonable inferences to be drawn therefrom sufficient to support the claim, then judgment on the evidence is improper. *Kroger Co. Sav–On Store v. Presnell* (1987), Ind.App., 515 N.E.2d 538, *trans. denied.* On review of a motion for judgment on the evidence, this court is bound by the same standards as the trial court. *Id.* For the reasons set forth below, we do not agree the trial court erred in denying KFG's motion for judgment on the evidence.

### Breach of Contract

KFG argues the Trustees' contract claim must fail because KFG never made any promises to Ashcraft Trucking. According to KFG, the Trustees' claim rests solely on the letter sent by KFG to Ashcraft Trucking on October 19, 1983. KFG insists the text of the letter, and particularly the term "commitment," clearly show KFG did not promise any particular volume of business to Ashcraft Trucking.

▪ KFG's argument must fail for two reasons. First, a promise is a "commitment [to act] in the future," *Woodall v. Citizens Banking Co.* (1987), Ind.App., 507 N.E.2d 999, 1000, *trans. denied,* and whether a promise exists is a question of fact for the jury. *City of Indianapolis v. Twin Lakes Enterprises, Inc.* (1991), Ind. App., 568 N.E.2d 1073, *trans. denied.* Therefore, KFG's contention that no promise was ever made as a matter of law is not well taken. Second, contrary to KFG's assertion the questioned letter is not the only evidence of the existence of promise made by KFG to Ashcraft Trucking. The letter to Ashcraft Trucking dated April 20, 1983, notifying Ashcraft of the new 602 line carried the reasonable inference that Ashcraft Trucking's shipping load would increase dramatically as a result of the production capacity of the new line. The letter to Ashcraft Trucking dated September 30, 1983, indicated Ashcraft should conservatively average 100 loads per week in 1984. Finally, the letter of October 19, 1983, indicated that because of the new machine Ashcraft should be in a position to haul an average of 455 loads per month.

There is no question that KFG was certainly hedging its bets. The written communications contained language of "forecasts" as well as "prediction." However, no special words are needed to create a promise, *Medtech Corp. v. Indiana Ins. Co.* (1990), Ind.App., 555 N.E.2d 844, *trans. denied,* and the evidence in this case was sufficient for the jury to determine that KFG promised to provide Ashcraft Trucking with an average of 455 loads of fiberglass per month.

KFG next argues that even if a contract existed between KFG and Ashcraft Trucking, it was unenforceable because 1) the contract contained no termination date and 2) the contract was in violation of the Interstate Commerce Act and therefore illegal.

▪ We first note there was no written contract between KFG and Ashcraft Trucking. Hence, any contract which did exist concerning the number of loads to be shipped per month and their duration must have been based on the oral and written communications made to Ashcraft by KFG. The terms of a contract not reduced to writing are matters to be interpreted by the jury. *Tuthill Corp., Fill–Rite Div. v. Wolfe* (1983), Ind.App., 451 N.E.2d 72. Here, the jury could have reasonably determined that KFG agreed to ship 455 loads per month to Ashcraft Trucking for the period of time in which Glyn was obligated to repay the loan to the White Motor Credit Corporation.

▪ Next, under the terms of the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.,* ("the Act"), a person may provide transportation service subject to the jurisdiction of the I.C.C. only if the person holds the appropriate certificate, permit or license. *See* 49 U.S.C. § 10921. According to KFG, any contract it had with Ashcraft was a "continuing agreement" which required contract carrier authority under the Act. Thus, concludes KFG, because Ashcraft only had common carrier authority the alleged contract is illegal and therefore unenforceable.

We agree with Ashcraft that its contract with KFG did not require contract carrier

authority. A contract is "continuing" under the Act only if it is: 1) entirely in writing, 2) bilateral, and 3) provides for the transportation of a series of shipments during a stated period of time. 49 C.F.R. 1053.1 (1990);[2] *Dan Barclay, Inc. v. Stewart & Stevenson Services, Inc.* (1991), D.Mass., 761 F.Supp. 194. Here, Ashcraft's contract with KFG was not in writing and thus was not a continuing agreement.

In viewing the evidence in a light most favorable to the plaintiffs, along with all reasonable inferences to be drawn therefrom, we conclude the jury could properly determine that a valid and enforceable contract existed between Ashcraft Trucking and KFG. The trial court did not err in denying KFG's motion for judgment on the evidence on the plaintiffs' contract theory of liability.

### Promissory Estoppel

■ The doctrine of promissory estoppel is an equitable claim for relief and encompasses the following elements: 1) a promise by the promisor, 2) made with the expectation that the promisee will rely thereon, 3) which induces reasonable reliance by the promisee, 4) of a definite and substantial nature, and 5) injustice can be avoided only by enforcement of the promise. *First Nat. Bank of Logansport v. Logan Mfg. Co., Inc.* (1991), Ind., 577 N.E.2d 949.

In this case KFG challenges only one element of the claim, namely: KFG made no promises to Ashcraft. We have already determined there was sufficient evidence presented to the jury supporting the plaintiffs' claim that a promise was made to Ashcraft by KFG. Therefore, the trial court did not err in denying KFG's motion for judgment on the evidence on the plaintiffs' promissory estoppel theory of liability.

### Actual Fraud

■ The essential elements of actual fraud are 1) a material representation of past or existing fact, 2) which representation is false, 3) made with knowledge or reckless disregard of its falsity, 4) which

causes reliance to the detriment of the person relying upon it. *Ryan v. Chayes Virginia, Inc.* (1990), Ind.App., 553 N.E.2d 1237, *trans. denied.* KFG contends its motion for judgment on the evidence should have been granted on the actual fraud theory of liability because plaintiffs presented no evidence on any element of the claim. We disagree.

■ The record reveals that while on a tour of the Shelbyville Plant in mid-September 1983, a representative of KFG told Glyn Ashcraft the 602 line was running at full capacity producing six million pounds of fiberglass per month. This was a misrepresentation of existing fact. KFG's production records showed the 602 line was barely producing one-half its capacity in September and October, 1983, and it never produced six million pounds of fiberglass per month before 1985.

KFG counters that its representation was not false when made and that plaintiffs failed to introduce any evidence to the contrary. In support of its argument, KFG directs our attention to testimony which indicates the machine had the capacity to produce six million pounds of fiberglass per month and on some days the machine was operating at full capacity. KFG suggests the machine was operating at full capacity on the day Glyn Ashcraft toured the facility.

KFG's argument amounts to invitation for this court to do that which it cannot, reweigh the evidence. When reviewing a motion for judgment on the evidence, we do not reweigh evidence. Rather, we consider only the evidence in favor of the non-moving party along with all the reasonable inferences to be drawn therefrom. *Sipes v. Osmose Wood Preserving Co. of America, Inc.* (1989), Ind., 546 N.E.2d 1223. Here, there was sufficient evidence presented to the jury for it to conclude KFG falsely represented the level of production of the 602 line with knowledge of its falsity. In like fashion there was sufficient evidence to demonstrate the misrepresenta-

**2.** We note that 49 C.F.R. 1053.1 was repealed on May 21, 1992 by 57 Fed.Register 21616. However- er, the regulation was in effect at all times relevant to this appeal.

tion was material and Glyn Ashcraft relied on the statement to his detriment. According to Glyn, he and his company would not have incurred the substantial debt to purchase new trucks had he known the 602 line was not producing six million pounds of fiberglass per month and thus be in a position to increase substantially the number of loads Ashcraft Trucking would handle for KFG.

The trial court did not err in denying KFG's motion for judgment on the evidence based on plaintiffs' actual fraud theory of recovery.

## Constructive Fraud

Constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *McDaniel v. Shepherd* (1991), Ind.App., 577 N.E.2d 239, 242, citing *Paramo v. Edwards* (1990), Ind., 563 N.E.2d 595, 598. Constructive fraud is an equitable theory of relief the elements of which are: 1) the existence of a duty due to a relationship between the parties, 2) violation of the duty by making deceptive material representations of past or existing facts or remaining silent when a duty to speak exists, 3) reliance thereon by the complaining party, 4) injury to the complaining party as a proximate cause thereof, and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *McDaniel, supra.*

KFG contends the trial court erred in denying its motion for judgment on the evidence on plaintiffs' constructive fraud theory of liability because there was no evidence supporting at least three elements of the claim, namely: 1) the existence of a duty due to a relationship between the parties, 2) violation of that duty by making deceptive material representations of past or existing fact, and 3) the gaining of an advantage by the party to be charged at the expense of the complaining party.

Concerning KFG's argument that it made no material representations of past or existing fact, we have already disposed of this issue in our discussion of the actual fraud claim. We need not further elaborate here. We turn therefore to KFG's contention that plaintiffs failed to introduce any evidence that a special relationship existed between Ashcraft Trucking and KFG that could form the basis of a constructive fraud claim.

In support of its argument KFG cites *Comfax Corp. v. North American Van Lines, Inc.* (1992), Ind.App., 587 N.E.2d 118, where this court affirmed summary judgment against plaintiffs' claim of constructive fraud. In that case we noted a special relationship forming the basis of a constructive fraud claim is shown when the parties have fiduciary duties to each other. We observed "the parties were involved in an arm's length, contractual arrangement and the requisite fiduciary relationship may not be predicated on such an arrangement." *Id.* at 125–26.

The facts in the case before us are clearly distinguishable from those in *Comfax.* Here, Ashcraft Trucking and KFG were not operating at arm's length. The business relationship between the parties was so close and intertwined that one witness described Ashcraft Trucking as KFG's "private fleet." Another witness testified that in all of his years as a consultant in the transportation industry, he had never seen such a close and special relationship between a shipper and a carrier as the one that existed between Ashcraft Trucking and KFG. The record reveals that in 1984, KFG loaned Ashcraft Trucking $60,000.00 to "help with the cash flow and with payment of some debts ..." *Record* at 3459. Glyn Ashcraft testified that with 20 years experience in the trucking industry, he never knew of an occasion where a company loaned money to one of its carriers. *Record* at 3458. There was sufficient evidence in this case from which the jury could determine that a special relationship existed between the parties.

KFG next contends there was no evidence it gained any advantage at the expense of Ashcraft Trucking. We disagree. Apparently KFG engaged in a significant amount of planning and forecast-

ing awaiting the start up of the 602 line. Insuring the availability of sufficient trucks to handle increased production was extremely important to KFG and represented an important component of the planning. The record reveals that once the machine was operational, it did not generate six million pounds of fiberglass per month. However, the new machine did increase production capacity so that KFG could have provided Ashcraft Trucking with at least 455 loads per month. KFG made a decision not to do so. Glyn Ashcraft and his company incurred substantial debt expecting to haul increased shipping loads of fiberglass. He had no way to anticipate that KFG had made a business decision to distribute shiploads of fiberglass among several carriers rather than honor its commitment to Ashcraft Trucking.

In viewing the evidence in a light most favorable to the plaintiffs along with all the reasonable inferences to be drawn therefrom, we conclude the jury could determine that a special relationship existed between KFG and Ashcraft Trucking and that KFG gained an advantage at Ashcraft Trucking's expense. The trial court did not err in denying KFG's motion for judgment on the evidence on the plaintiffs' constructive fraud theory of liability.

## II.

KFG next challenges the judgment in favor of Neil Shook, the Trustee appointed over the bankruptcy estate of Glyn Ashcraft. According to KFG, Glyn's personal losses are entirely derivative of the harm done to Ashcraft Trucking and thus there is no basis for a personal claim against KFG.

■■■ As a general rule, shareholders of a corporation may not maintain an action in their own names to redress an injury done to the corporation even if the value of their stock is impaired as a result of the injury. And this is so even where the corporation and the shareholder are the same. *Moll v. South Central Solar Systems, Inc.* (1981), Ind.App., 419 N.E.2d 154, 161. Rather, a personal cause of action arises when there is a breach of duty owed specially to the shareholder which is separate and distinct from the duty owed to the corporation. *Sacks v. American Fletcher Nat. Bank & Trust Co.* (1972), 258 Ind. 189, 279 N.E.2d 807. A shareholder's personal guarantee of a loan made to the corporation may provide the basis for a personal cause of action. *Id.*

■■■ In this case, White Motor Credit Corporation extended a loan to Ashcraft Trucking Company based in part on Glyn Ashcraft's personal guarantee. Therefore, if KFG owed a duty to Glyn to provide additional outbound shiploads of fiberglass per month, separate and distinct from the duty owed to Ashcraft Trucking, then Glyn is entitled to pursue a personal cause of action. In determining whether a duty exists we must balance (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992, *reh. denied.*

■■■ When KFG first expanded its operations in 1979, Theis Knauf, president of the company, informed Glyn that if Ashcraft Trucking purchased additional trucks and hauled additional fiberglass, then KFG would insure that Ashcraft Trucking would not go out of business. Glyn executed a personal guaranty for a loan, purchased the trucks, additional loads were hauled and indeed Ashcraft Trucking became financially successful. By 1982, Ashcraft Trucking was receiving 75% of KFG's total truckload shipments. *Record* at 3188. Glyn came to trust Theis and rely on his commitments.

In 1983, Glyn was apprehensive about the amount of debt his company would incur if additional trucks were purchased in order to service KFG's additional business generated by the 602 line. Glyn expressed the notion of not participating in· the increased business but rather continuing to haul his current load. However, a representative for KFG, informed Glyn there was no option. Rather, KFG would obtain another carrier to handle whatever KFG decided to give them. Glyn was faced with

a Hobson's choice, either purchase new trucks or loose the KFG business. Glyn purchased the trucks. When he signed the personal guarantee for a loan, KFG was certainly aware Glyn was doing so to accommodate the increase in business to be provided by KFG. In fact, representatives of KFG signed the escrow agreement which was part of the loan.

The foregoing facts demonstrate a relationship between Glyn Ashcraft and KFG which imposed a duty on KFG separate and apart from the duty KFG owed to Ashcraft Trucking. Further, KFG could reasonably foresee that if Ashcraft Trucking did not receive the increased business, then the loan for the new trucks could not be paid and creditors would call Glyn's personal guarantee.

Finally, as our supreme court observed in *Webb, supra,* "[d]uty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id.* at 997, *quoting* PROSSER AND KEATON ON TORTS, § 53 (5th ed. 1984). Under the facts before us there are no policy considerations that would deny protection to Glyn Ashcraft. We therefore conclude KFG owed a duty to Glyn Ashcraft to provide additional outbound shiploads of fiberglass per month, separate and distinct from the duty owed to Ashcraft Trucking.

### III.

KFG next takes issue with various instructions the trial court gave to the jury as well as instructions KFG tendered but the trial court refused.

■■■■ The giving of jury instructions is a matter within the trial court's sound discretion, which we review only for abuse. *Weller v. Mack Trucks, Inc.* (1991), Ind. App., 570 N.E.2d 1341. An instruction tendered by a party must be a correct statement of the law and be supported by the evidence. *Wielgus v. Lopez* (1988), Ind. App., 525 N.E.2d 1272. In our review we will construe the instructions in harmony with each other. *Id.* Further, the trial court's refusal to give a tendered instruc-

tion is grounds for reversal only if it is shown that the instruction correctly states the law, the instruction is supported by the evidence, the substance of the refused instruction was not adequately covered by other instructions, and there is a reasonable probability that the refusal of the instruction adversely affected the substantial rights of the complaining party. *Sullivan v. Fairmont Homes, Inc.* (1989), Ind.App., 543 N.E.2d 1130, *trans. denied.*

KFG first challenges the trial court's Final Instructions Nos. 6A and 10. Both instructions were directed at Ashcraft Trucking's promissory estoppel claim. According to KFG, the trial court erred in giving these instructions because they "omitted the element of breach of the promise which is essential before damages can be awarded." *Appellant's Brief* at 38. KFG is mistaken.

■■■■ Breach of promise is not an element of promissory estoppel; rather, the elements are: 1) a promise by the promisor, 2) made with the expectation that the promisee will rely thereon 3) which induces reasonable reliance by the promisee, 4) of a definite and substantial nature, and 5) injustice can be avoided only by enforcement of the promise. *Logan Mfg., supra.* These elements were contained in the challenged instructions. We find no error here.

■■■■ KFG next challenges the trial court's Final Instruction No. 6 which defines "promise" as a voluntary commitment or undertaking. According to KFG, the word commitment in a key document was in controversy throughout the trial. Therefore, concludes KFG, this instruction invaded the province of the jury by defining the word "commitment" and "promise" as being synonymous. KFG's argument lacks merit. The instruction is a correct statement of the law, *see Woodall, supra,* and the trial court did not err by giving it to the jury.

KFG next asserts the trial court erred in giving Final Instruction No. 7 which reads in relevant part:

If you find that Knauf Fiber Glass, GmbH made a promise to Ashcraft

Trucking that contained a condition which, if [it] occurred, relieved Knauf Fiber Glass, GmbH of its promise, then it is Knauf Fiber Glass' burden to prove that such condition occurred before it can be relieved of its promise.

*Record* at 2407.

The parties here agree that the condition referred to in the instruction is based on language in the October 19, 1983 letter. The parties disagree on whether the language in the letter constitutes a condition precedent or a condition subsequent. According to KFG, the language constitutes a condition precedent and therefore giving the instruction was error because it incorrectly places the burden of proof on KFG. In like fashion KFG argues the trial court erred in refusing to give KFG's instruction which placed the burden of proof on Ashcraft Trucking.

■ A condition precedent "must be performed before the agreement of the parties shall become a binding contract, or it may be a condition which must be fulfilled before the duty to perform an existing contract arises." *Capitol Land Co. v. Zorn* (1962), 134 Ind.App. 431, 184 N.E.2d 152, 158 *trans. denied.* On the other hand, a condition subsequent "is one which, if performed or violated, as the case may be, defeats the contract." *Id.* at 158. Conditions precedent are disfavored and must be explicitly stated. *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.* (1991), Ind.App., 582 N.E.2d 872.

■ In the letter, the language "remaining competitive," suggests Ashcraft Trucking's rates and services were already competitive and had been so in the past. There was nothing additional for Ashcraft Trucking to perform. We conclude the challenged language was not a condition precedent and thus Final Instruction No. 7 was properly given as a correct statement of the law. *See Zebrowski and Assoc., Inc. v. City of Indianapolis* (1983), Ind. App., 457 N.E.2d 259, 262 (when performance is promised in general terms, followed by specific exceptions and limitations, the party promising performance has

the burden of proving the case falls with the exception).

KFG next argues the trial court erred by giving Final Instruction Nos. 23A and 26. These instructions focus on Glyn Ashcraft's personal losses under plaintiffs' theories of fraud and constructive fraud and discuss the circumstances under which damages for mental distress may be awarded.

■ KFG acknowledges damages for mental distress may be awarded on a claim of intentional fraud. Indeed, the law in this area is well settled. *See Shuamber v. Henderson* (1991), Ind., 579 N.E.2d 452; *Captain & Co., Inc. v. Stenberg* (1987), Ind.App., 505 N.E.2d 88, *trans. denied; First Nat. Bank of New Castle v. Acra* (1984), Ind.App., 462 N.E.2d 1345; *Baker v. American States Ins. Co.* (1981), Ind.App., 428 N.E.2d 1342, *trans. denied.* However, quoting language from *Charlie Stuart Oldsmobile, Inc. v. Smith* (1976), 171 Ind. App. 315, 327, 357 N.E.2d 247, KFG contends the type of fraud alleged to have occurred in this case is not "likely to provoke an emotional disturbance." *Id.* at 327, 357 N.E.2d at 254.

■ KFG's argument is unavailing. Whether the fraud alleged in this case is of the kind likely to cause mental and emotional distress is a question of fact for the jury. *Baker, supra.* There is no error here.

KFG next argues the trial court erred in failing to give its tendered instruction concerning the appropriate damages to be awarded on the promissory estoppel claim. KFG's tendered instruction reads in pertinent part as follows:

If a promise is enforceable because the person to whom the promise was made relied upon it, then damages may be awarded for nonperformance of the promise as if there was a contract. However, if the promise on which the person relied was terminable at will, then the person may only recover as damages those amounts he reasonably expended

in reliance on the promise before nonperformance of the promise was known. *Record* at 2125.

KFG contends the alleged promise relied upon by Glyn Ashcraft and Ashcraft Trucking was terminable at will and therefore affords recovery only for reliance damages and not for expectation damages. According to KFG, its instruction should have been given to the jury because it was a correct statement of the law, warranted by the evidence, and not covered by other instructions.

For at least two reasons we disagree that KFG's tendered instruction is a correct statement of the law. First, KFG cites no authority discussing or explaining the concept of a terminable at will promise nor does our own research reveal any such authority. We of course recognize terminable at will contracts. However, a promise is only one element of an enforceable contract. *Burdsall v. City of Elwood* (1983), Ind.App., 454 N.E.2d 434. Second, it is axiomatic that where a contract is terminable at the will of either party no damages can be assessed for breach of that contract when one party exercises the power to terminate. *House of Crane, Inc. v. H. Fendrich, Inc.* (1970), 146 Ind.App. 478, 256 N.E.2d 578. In this case, to the extent KFG's proposed instruction suggests the jury may award damages for breach of a contract terminable at will, the instruction presents an inaccurate statement of the law. The trial court did not err in refusing to give KFG's tendered Instruction No. 8.

KFG also challenges Final Instruction No. 23, which reads:

If you find for Ashcraft Trucking, Inc., on any one of its claims, and if you further find that Knauf Fiber Glass, GmbH's actions caused Ashcraft to be rendered bankrupt, then you may consider as damages the value of Ashcraft Trucking, Inc., any lost profits it would have earned and earnings that would have been reasonably earned on the lost profits and the value of the business.

*Record* at 2425. KFG contends the instruction allows speculation and permits double recovery. According to KFG, the value of a business includes future earnings and thus a plaintiff cannot receive both the fair market value of its business plus damages for loss of future profit.

[28] We agree the instruction could be interpreted as allowing double recovery. More importantly, however, the instruction is confusing, awkwardly worded, and represents an inaccurate statement of the law. When an established business is injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business, with interest, by reason of the wrongful act. The diminution may be measured by loss of profit. 25 C.J.S. *Damages* § 90b; *see also Maddox v. Yocum* (1944), 114 Ind.App. 390, 52 N.E.2d 636. Damages for lost profits are confined to net profits. *Greives v. Greenwood* (1990), Ind.App., 550 N.E.2d 334; *Prudential Ins. Co. of America v. Executive Estates, Inc.* (1977), 174 Ind.App. 674, 369 N.E.2d 1117.

In the case before us, the instruction does not mention diminution in value and it is not clear whether "earnings" on the lost profits are the same as "interest" on loss profits. Further, even if we were to liberally construe the instruction as meaning diminution in the value of Ashcraft Trucking, the conjunction "and" suggests that lost profits may be awarded along with the company's diminished value. Clearly, the law is otherwise.

Instruction No. 23 is an incorrect statement of the law and the trial court erred in giving it to the jury. However, an erroneous instruction requires reversal only if it could have formed the basis for the jury's verdict. This court will assume that the erroneous instruction influenced the jury's verdict unless the evidence of record shows the verdict could not have differed even with a proper instruction. *Canfield v. Sandock* (1990), Ind., 563 N.E.2d 1279, *reh. denied.*

There was extensive and contradictory testimony presented to the jury concerning the value of Ashcraft Trucking. For example, Plaintiff Stein's expert testified that by the end of 1983, Ashcraft Trucking had a fair market value of

$4,289,538.00 and by 1988, it had a fair market value of $5,037,593.00. Obviously, this testimony does not seem consistent with the idea of a diminution in value. The expert also testified that Ashcraft Trucking lost interest income in the total amount of $995,303.00 and lost cumulative earnings of $1,450,037.00. However, the lost interest income was based on estimated earnings and the 1988 valuation of the business. *Record* at 5901. During closing statements, counsel for Plaintiff Stein, argued "Ashcraft's damages consisted of three (3) elements. Ashcraft had lost earnings, lost interests, and the value of the company ... These are the damages that the trucking company has alleged." *Record* at 7815. He then asked the jury to return a verdict which comprised those elements of damage in an amount in excess of $7,000,000.00. On the other hand, KFG's expert testified that using one valuation method, Ashcraft's fair market value in 1983, equalled $734,000.00 and using an alternative method, the fair market value for Ashcraft in 1983, ranged between $330,000.00 to $450,000.00.

The jury returned a verdict in favor of Plaintiff Stein, Bankruptcy Trustee for Ashcraft Trucking, in the amount of $2,027,000.00. The amount is well within the general figures presented to the jury. However, given the conflicting testimony and reasonable inferences to be drawn therefrom concerning business valuation, profits, earnings, and interest, the verdict could have been different if the jury had been given a proper instruction on the measure of damages. *See Canfield, supra.* Therefore, we must reverse the judgment in favor of Stein and remand this cause for retrial on the issue of damages.

### IV.

KFG next argues the trial court erred by admitting, over KFG's objection, certain portions of the video taped deposition of former KFG employee, Harold Walters. Walters gave very lengthy testimony, part of which concerned his opinion that Theis Knauf was dishonest, used people, exhibited a calculating business mentality, and that Walters and other KFG personnel had been unfairly terminated. According to KFG, Walters' testimony was irrelevant and designed solely to inflame the passions of the jury.

Evidence is relevant if it tends to prove a material fact or if it makes an inference more probable than it would be absent the evidence. *United Farm Bureau Mut. Ins. Co. v. Cook* (1984), Ind.App., 463 N.E.2d 522. Rulings concerning relevancy of evidence are entrusted to the sound discretion of the trial court and will be reversed only upon a showing of abuse. *Indiana Nat. Corp. v. FACO, Inc.* (1980), Ind.App., 400 N.E.2d 202.

Actual Fraud was one of the theories on which the Trustees' claim for damages was based. According to the Trustees, Walters' testimony concerning KFG's business practices and business philosophy was probative of the intent necessary to sustain an action for fraud. We disagree for two reasons.

First, contrary to the Trustees' assertion, Walters' testimony was not limited to KFG's business practices. Rather, his testimony focused on Theis Knauf and the Knauf family. Neither Theis Knauf nor his family were parties to this action. Thus, Walters' testimony concerning Knauf's alleged dishonesty and calculating business practice was not relevant to show KFG's business practice and business philosophy. Second, in order for past acts or occurrences to be admissible as proof that a particular act was done or that certain occurrences happened, they must be similar. *Murphy v. Indiana Harbor Belt R. Co.* (1972), Ind.App., 154 Ind.App. 103, 289 N.E.2d 167. In this case we see no similarity between Walters' challenged testimony and KFG's false representation that the 602 line was running at full capacity producing six million pounds of fiberglass per month.

We conclude that the portion of Walters' video taped deposition concerning Walters' opinion that Theis Knauf was dishonest, used people, exhibited a calculating business mentality, and that Walters and other KFG personnel had been unfairly terminat-

ed was not relevant to any issue in this case including the Trustees' claim of actual fraud. The trial court erred in allowing the testimony into evidence.

■ However, the mere showing that evidence is irrelevant is not sufficient to warrant reversal. KFG must also show that it was prejudiced by the admission of the evidence. *Citizens Nat. Bank of Whitley County v. Stasell* (1980), Ind.App., 408 N.E.2d 587, *reh. denied.* According to KFG, it was prejudiced because the jury "found liability where no factual basis existed and awarded damages far in excess of any recoverable loss." *Reply Brief of Appellant* at 46.

For reasons discussed elsewhere in this opinion, we hold there was sufficient evidence to sustain the jury's verdict on each of the Trustees' theories of recovery. KFG's argument to the contrary amounts to an invitation for this court to reweigh the evidence. We decline. In the following section we examine KFG's claim that the damage award is excessive.

## V.

■ This court employs a strict standard when reviewing a claim that an award of damages is excessive. We neither reweigh evidence nor judge witness credibility. Rather, we consider only the evidence favorable to the award. *Upchurch v. Henderson* (1987), Ind.App., 505 N.E.2d 455. A judgment is not excessive unless the amount cannot be explained upon any basis other than prejudice, passion, partiality, corruption, or some other improper element. *Crump v. Rhodes* (1986), Ind.App., 488 N.E.2d 741 *trans. denied.*

■ Because of Final Instruction No. 26, there were three elements the jury could properly consider in awarding damages to Plaintiff Shook: Glyn Ashcraft's loss of property, loss of credit, and mental distress. *Record* at 2429, 7967–68. According to Shook, the value of Glyn Ashcraft's personal property included a warehouse valued at over $500,000.00, two certificates of deposit worth $20,155.00, a 1983 Ford Van valued at approximately $9,000.00 and a second home which Glyn

was in the process of purchasing and on which he had made a $2,000.00 down payment.

We first note the warehouse which Shook contends was a part of Glyn's personal property, was actually owned by a separate corporation, Ashcraft Warehouse, Inc. Glyn was president and shareholder of the corporation. In his capacity as president, Glyn pledged the corporate assets of Ashcraft Warehouse Inc. to guarantee the 1983 loan from White Motor Credit Company. This guarantee was separate from Glyn's personal guarantee which was also given for the loan. Hence, only the value of Glyn's shares in Ashcraft Warehouse, Inc., and not the value of the warehouse itself could properly be included as part of Glyn's loss of personal property.

Be that as it may, even if we were to assume the value of Glyn's shares in the warehouse were only nominal, the jury's general verdict in favor of Shook for $1,722,000.00 is nonetheless supported by the evidence and can be explained on grounds other than prejudice, passion, partiality, corruption or some other improper element.

The record shows that prior to the bankruptcy, Glyn Ashcraft was a successful businessman, owning a company that was once characterized by Inc. Magazine as the 79th fastest growing company in the United States. *Record* at 3143, 3157–59. In 1983, Ashcraft Trucking had net earnings in excess of a quarter million dollars. *Record* at 4866. Glyn's success was further evident by his ability to borrow money on his personal guarantee (albeit with other assurances) of over one million dollars in 1979 and nearly three million dollars in 1983. Since the bankruptcy, Glyn's credit standing has been destroyed. According to Glyn, he now owns a small tire recapping business from which he made about $26,-000.00 the year after the bankruptcy. Glyn has to pay cash for nearly everything he purchases, and his inability to obtain credit has drastically prohibited the growth of his business.

■ This court has acknowledged that the amount of damages appropriate for harm to credit and business standing is

difficult to prove. However, where a fact finder determines that harm has occurred, and the only uncertainty is the dollar value, then an award in some amount is appropriate. *American Fletcher Nat. Bank & Trust Co. v. Flick* (1969), 146 Ind.App. 122, 252 N.E.2d 839. Further, substantial damages may be awarded where the evidence supports such an award. *Id.* at 252 N.E.2d 847 (remand for entry of nominal damages only where no evidence of substantial damages shown).

We agree with KFG that the record here is silent concerning the dollar value actually attributed to the harm Glyn suffered by reason of his loss of credit. *Cf. First Nat. Bank of New Castle v. Acra* (1984), Ind. App., 462 N.E.2d 1345 (actions of defendant resulted in the loss to plaintiff of a $60,000.00 line of credit). However, there is ample evidence in this case that Glyn suffered harm to his credit. Given his obviously superior credit and business standing before the bankruptcy and his virtual lack of any credit standing today, the jury could have reasonably made a substantial award on this element of damage.

As to mental distress, the record reveals that as a result of the bankruptcies Glyn Ashcraft became embarrassed, humiliated and depressed, and even talked of suicide. Carolyn Ashcraft, Glyn's wife, also testified that Glyn has continuing heart problems along with high blood pressure, all of which she attributes to stress caused by the bankruptcies. The amount of damages awarded for mental or emotional anguish can neither be defined nor calculated with any degree of mathematical certainty. *Stivers v. Stevens* (1991), Ind. App., 581 N.E.2d 1253, *trans. denied.* As a result, the jury is afforded a great deal of latitude and discretion in making such awards. Where the damage award is so outrageous as to indicate the jury was motivated by passion, prejudice, partiality, or the consideration of improper evidence, we will find the award excessive. *Groves v. First Nat. Bank of Valparaiso* (1988), Ind. App., 518 N.E.2d 819.

In this case the damage award is not excessive. The evidence concerning loss of business credit and mental distress is suffi-cient to sustain the jury's verdict and this is so in spite of the improperly admitted testimony concerning Theis Knauf and his family.

## CONCLUSION

The verdict in favor of Plaintiff Sidney Stein is reversed because the jury instruction concerning damages was erroneous and the evidence of record shows the verdict could have been different had the jury been given a proper instruction. The verdict in favor of Plaintiff Neil Shook is affirmed. This cause is remanded for a new trial on the issue of damages as to Plaintiff Sidney Stein. In all other respects the judgment is affirmed.

JUDGMENT IS AFFIRMED IN PART, REVERSED IN PART, AND THE CAUSE REMANDED FOR NEW TRIAL.

BARTEAU and NAJAM, JJ., concur.