47 F.3d 111
 CHENEY BROTHERS, INCORPORATED, Plaintiff-Appellant,
v.
BATESVILLE CASKET COMPANY, INCORPORATED; Hillenbrand
Industries; American Motorist Insurance Company,
a member of the Kemper National
Insurance Companies,
Defendants-Appellees.
 No. 93-2639.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 2, 1994.
Decided Feb. 3, 1995.
 
 ARGUED: James B. Richardson, Jr., Svalina, Richardson & Smith, Columbia, SC, Stanford E. Lacy, Collins & Lacy, Columbia, SC, for appellant. Thomas S. Tisdale, Jr., Young, Clement, Rivers & Tisdale, Charleston, SC, for appellees. ON BRIEF: Stephen P. Groves, Young, Clement, Rivers & Tisdale, Charleston, SC, for appellees.
 Before ERVIN, Chief Judge, MICHAEL, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 Affirmed by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge MICHAEL and Senior Judge PHILLIPS joined.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 This appeal stems from a dispute between the nation's largest casket manufacturer, Batesville Casket Company, and its velvet supplier, Cheney Brothers, Inc. Appellant Cheney Brothers alleges that Batesville Casket and its parent company, Hillenbrand Industries, Inc., tortiously misrepresented their intention to continue a business relationship with Cheney Brothers. Because Cheney Brothers had no right to rely on appellees' representation under South Carolina law, we affirm the district court's dismissal of appellant's claim as a matter of law.
 
 I.
 
 2
 Appellant Cheney Brothers, Inc. ("Cheney") was a commercial manufacturer of velvet incorporated in Delaware and operating primarily in South Carolina. Appellees Hillenbrand Industries, Inc. ("Hillenbrand") and its wholly owned subsidiary Batesville Casket Company, Inc. ("Batesville") are incorporated and have their principal places of business in Indiana. Cheney Brothers had been in existence for over one hundred years, operating basically in Manchester, Connecticut before moving to Mullins, South Carolina in 1984. Cheney was the country's major producer of velvet fabric used to line caskets. A majority of Cheney's production went to Batesville for use in its manufacture of caskets. In fact, from 1971 until 1989, over ninety-five percent of Batesville's velvet supply was provided by Cheney. Despite their long-term affiliation, Batesville/Hillenbrand and Cheney did not have a contractual relationship, as Batesville purchased its fabric through Cheney's exclusive distributor, Theo. Tiedemann & Sons, Inc. ("Tiedemann"). Nor was there a contract between Tiedemann and Batesville, which by agreement could cancel any purchase order upon thirty days notice.
 
 
 3
 Prior to 1989, all casket velvet, including Cheney's, was woven exclusively with rayon. In 1987, Batesville began to research and develop a petroleum-based alternative to rayon made from polyester, a venture the company named "Project Enterprise." In May 1988, Cheney's senior management attended a meeting with high-level Batesville/Hillenbrand officials at the company's Indiana headquarters, at which time Cheney's representatives were shown projections of a ten to fifteen percent annual increase in Batesville's casket production and, consequently, its need for velvet. Batesville/Hillenbrand management did not at any point disclose their development of a petroleum-based alternative to Cheney's velvet. Following a presentation to high-level Hillenbrand officials in October 1988, Batesville adopted a target timetable for switching from rayon to polyester velvet by the fall of 1989. The company enlisted textile manufacturer Collins and Aikman to produce this new commodity.
 
 
 4
 While Batesville was developing an alternative to rayon-based velvet, Hillenbrand negotiated to purchase an interest in Cheney in order to insure itself an affordable fabric supply. On September 8, 1988, Hillenbrand agreed to buy a fifty percent interest in Cheney for five million dollars, with an option to buy the rest of the company later. This transaction was contingent on the results of a pending investigation by Hillenbrand of Cheney's operations and financial status. During the course of this investigation, Hillenbrand discovered that Cheney, although historically profitable, was highly leveraged and experiencing financial instability. The inquiry also raised significant questions regarding potentially serious environmental problems at the Cheney facility. With notice of Cheney's fiscal and environmental difficulties, as well as Batesville's Project Enterprise alternative, Hillenbrand declined to carry out the proposed transaction in December 1988.
 
 
 5
 In the month following Hillenbrand's rejection of the agreement to buy Cheney, officers from both companies met to discuss the status of their relationship. At this meeting, Batesville/Hillenbrand executives told Cheney officials that the company had no intention of altering its present relationship and that "business as usual" would continue. Based on this representation, and Cheney's desire to maintain its association with Batesville, the velvet supplier opted not to diversify its output to include apparel velvet.[1]
 
 
 6
 On November 6, 1989, Batesville advised Cheney's distributor Tiedemann that it would no longer purchase velvet from Cheney and began phasing in use of the new polyester velvet. Batesville bought rayon-based velvet from Cheney for the last time in June of 1990, thereby terminating their eighteen-year relationship.
 
 
 7
 After Tiedemann advised Cheney of Batesville's decision, Cheney equipped its facility to produce apparel velvet rather than casket velvet. The company, however, was unable to re-tool in time to compete in the buying season for the 1990 apparel market, however, in which the demand for velvet was quite strong.[2] Ultimately, Cheney was unsuccessful in its attempt to penetrate the apparel market and remained unprofitable. The company shut down its Mullins, South Carolina facility in June 1991.
 
 
 8
 On August 28, 1991, Cheney filed an action against Batesville and Hillenbrand in the Court of Common Pleas for Marion County, South Carolina. The complaint alleged, inter alia, a state law claim for misrepresentation. Asserting diversity jurisdiction under 28 U.S.C. Sec. 1332, the defendants removed the case to the United States District Court for the District of South Carolina pursuant to 28 U.S.C. Sec. 1441.
 
 
 9
 A jury trial began on November 15, 1993. Four days later, at the close of plaintiff's case, the district court granted defendants' motion for judgment as a matter of law as to all claims, including the one for misrepresentation at issue in this appeal. The court first emphasized that the parties had no contractual obligation to one another. Thus, the statement by Batesville/Hillenbrand officials that "business as usual" would continue was not necessarily false. The court then concluded that even if the defendants' representations could be considered false, there was no actionable misrepresentation because Cheney had no right to rely on appellees' representation and Batesville/Hillenbrand had no duty to disclose its business plans. Cheney filed a timely notice of appeal to this court.
 
 II.
 
 10
 This court reviews de novo the district court's granting of Batesville's motion for judgment as a matter of law. Gairola v. Commonwealth of Va. Dep't of Gen. Services, 753 F.2d 1281, 1285 (4th Cir.1985). The applicable test is whether " 'there can be but one conclusion as to the verdict that reasonable jurors could have reached.' " Id. (quoting Wheatley v. Gladden, 660 F.2d 1024, 1027 (4th Cir.1981)). We must view the evidence in the light most favorable to the appellant, giving that party the benefit of all reasonable inferences. Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir.1988).
 
 
 11
 Under South Carolina law, which applies in this case, see Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Harrison v. Edison Bros. Apparel Stores, Inc., 924 F.2d 530 (4th Cir.1991), a plaintiff must prove eight elements in order to make out a claim for misrepresentation or fraud. These elements are: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. Ardis v. Cox, --- S.C.App.----, 431 S.E.2d 267, 269 (1993); DeHart v. Dodge City of Spartanburg, Inc., --- S.C.App. ----, 427 S.E.2d 720, 722 n. 1 (1993). The evidence of each component must be "clear, cogent and convincing," and failure to prove any one element is fatal to the plaintiff's cause of action. DeHart, 427 S.E.2d at 722. The elements of constructive fraud under South Carolina law are the same, with one important exception. To recover for constructive fraud, a plaintiff does not have to prove intentional misrepresentation. Woods v. State, --- S.C.App. ----, 431 S.E.2d 260, 263 (1993). Thus, Cheney does not have to offer evidence of intentional deception on the part of Batesville/Hillenbrand to state a cognizable claim.
 
 
 12
 In this case, Batesville and Hillenbrand are entitled to judgment as a matter of law because Cheney failed to satisfy at least one element of its misrepresentation cause of action. As the trial judge correctly concluded, Cheney had no right to rely on any misrepresentation Batesville arguably made, and its complaint therefore fails as a matter of law. In the 1993 case of DeHart v. Dodge City, the South Carolina Court of Appeals confirmed that "there is no right to rely, as required to establish fraud, where there is no confidential or fiduciary relationship, and there is an arm's length transaction between mature, educated people." DeHart, 427 S.E.2d at 722; see also Poco-Grande Inv. v. C & S Family Credit, Inc., 301 S.C. 323, 391 S.E.2d 735 (1990).[3] Generally, the cases in which South Carolina courts have recognized a right to rely involve parties of disparate economic and bargaining strength. See, e.g., Thomas v. American Workmen, 197 S.C. 178, 14 S.E.2d 886, 888 (1941). Cheney, Batesville, and Hillenbrand were sophisticated multi-million dollar corporations transacting at arm's length. Even Cheney admits there was no fiduciary or confidential relationship between them. Indeed, the parties were not under any contractual obligation to each other whatsoever. Under South Carolina law, Cheney thus had no right to rely on Batesville's representation that "business as usual" would continue.
 
 
 13
 Related to the "right to rely" element is the necessity that the reliance be reasonable. See Thomas, 14 S.E.2d at 887-88 ("It is undoubtedly true that the principle of the right of reliance is closely bound up with a duty on the part of the representee to use some measure of protection and precaution to safeguard his interest."). Whether this condition is met depends "upon the various circumstances involved, such as the form and materiality of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties." Id. at 888. On the facts of this case, the factors that relieve Cheney of any right to rely also make its reliance on Batesville's representation unreasonable. A few generalized comments indicating a basic intention to continue a voluntary business association cannot justify reliance on the part of a company in Cheney's position.
 
 
 14
 In addition, Cheney arguably fails on the falsity element of a fraud claim. Batesville/Hillenbrand's representation that "business as usual" would continue could be characterized as an accurate description of the company's immediate short-term plans. It was at no point under any legal duty to purchase velvet from Cheney, a situation which in fact remained unchanged. Although Batesville was developing an alternative fabric supply at the time, it continued, consistent with "business as usual," to purchase velvet from Cheney for almost one and one-half years after its officials made the statements at issue. As South Carolina courts have repeatedly observed, "[n]ot every statement made in the course of commercial dealings is actionable at law." E.g., AMA Management Corp. v. Strasburger, 309 S.C. 213, 420 S.E.2d 868, 874 (1992).
 
 
 15
 Cheney also argues that Batesville had an affirmative duty to disclose its intentions, relying on some older South Carolina cases recognizing a cause of action for what may be termed fraudulent concealment. According to the South Carolina courts, there are three situations in which a duty exists to disclose information regarding one's intentions:
 
 
 16
 (1) where it arises from a preexisting definite fiduciary relation between the parties; (2) where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied; (3) where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure without regard to any particular intention of the parties.
 
 
 17
 Ardis, 431 S.E.2d at 270 (quoting Jacobson v. Yaschik, 249 S.C. 577, 155 S.E.2d 601, 605 (1967)). The instant case involved commercial transactions between two large corporations bargaining at arm's length and under no contractual responsibilities to each other. Thus, an affirmative duty on Batesville's part to disclose its intentions did not arise under the three narrow exceptions described above.
 
 
 18
 For the foregoing reasons, the judgment of the district court granting Batesville and Hillenbrand's motion for judgment as a matter of law on Cheney's claim of misrepresentation is hereby
 
 
 19
 AFFIRMED.
 
 
 
 [1]
 Casket velvet is manufactured using thirty-nine inch looms, while forty-eight inch looms are required to produce apparel velvet. Thus, some alteration of a manufacturer's equipment is necessary to convert from production of one to the other
 
 
 [2]
 At oral argument, Cheney indicated that it would have taken the company approximately eight months to re-tool
 
 
 [3]
 There is some indication in at least one recent South Carolina case that the right to reliance standard may be more stringent in cases of constructive, rather than actual, fraud. See Ardis, 431 S.E.2d at 270. In any event, the "right to rely" element in actual fraud cases would require nonetheless that a party's reliance be reasonable