**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

R.J. CLARKSON COMPANY,
INCORPORATED, d/b/a Jenn-Air of the
Carolinas,
<u>Plaintiff-Appellant,</u>

v.

THE JENN-AIR COMPANY, a wholly
owned subsidiary of the Maytag

Corporation; MAYTAG CORPORATION;
JERRY K. RINEHART; DONALD M.
LORTON; CARL MOE; LARRY NEPPLE,
<u>Defendants-Appelles,</u>

and

MARK D. WILSON,
<u>Defendant.</u>

No. 95-1084

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Dennis W. Shedd, District Judge.
(CA-92-1729-3-19)

Argued: March 7, 1996

Decided: May 7, 1996

Before WILKINSON, Chief Judge, and WILLIAMS and
MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Patrick Freeman, Columbia, South Carolina, for Appellant. Harold Simmons Tate, Jr., Manton McCutchen Grier, SINKLER & BOYD, P.A., Columbia, South Carolina, for Appellees. **ON BRIEF:** S. Jahue Moore, KIRKLAND, TAYLOR, WILSON, MOORE & ALLEN, West Columbia, South Carolina, for Appellant. Hamilton Osborne, Jr., SINKLER & BOYD, P.A., Columbia, South Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In this diversity case, R.J. Clarkson Company, Inc. (Clarkson Co.) sued The Jenn-Air Company and its parent company, Maytag Corporation, alleging fraud, breach of contract, and violations of the South Carolina Unfair Trade Practices Act (SCUTPA), S.C. Code §§ 39-5-20(a) & 140(a). Jenn-Air and Maytag asserted a counterclaim seeking payment for goods sold and delivered. Robert A. Clarkson (Mr. Clarkson), the president of Clarkson Co., was added as a defendant on the counterclaim. The district court (1) granted Jenn-Air and Maytag summary judgment before trial on Clarkson Co.'s SCUTPA claim, (2) granted Jenn-Air and Maytag judgment as a matter of law on Clarkson Co.'s remaining claims after Clarkson Co. rested its case at trial, and (3) after a jury verdict, entered a judgment on the counterclaim for a little over $1.4 million against Clarkson Co. and against Mr. Clarkson personally. Clarkson Co. appeals the grant of summary judgment and judgment as a matter of law to Jenn-Air and Maytag on the fraud, breach of contract, and SCUTPA claims, but neither it nor Mr. Clarkson appeals the judgment entered on the counterclaim. We affirm as to all issues.

I.

Because this case comes before us after grants of summary judgment and judgment as a matter of law, our review is <u>de novo</u>, and we view the record in the light most favorable to Clarkson Co., giving it the benefit of all reasonable inferences. <u>Herold v. Hajoca Corp.</u>, 864 F.2d 317, 319 (4th Cir. 1988), <u>cert. denied</u>, 490 U.S. 1107 (1989). With respect to the SCUTPA claim, we consider the record as it existed at the time the district court granted summary judgment, ignoring evidence later presented at trial on other claims. <u>U.S. East Telecommunications, Inc. v. US West Communications Servs., Inc.</u>, 38 F.3d 1289, 1301 (2d Cir. 1994).

Clarkson Co. distributed Jenn-Air kitchen appliances for many years. Jenn-Air employed what the parties have described as a "two-step" distribution system, whereby individually owned and operated distributors bought Jenn-Air products and resold them to retailers and home builders. Maytag bought Jenn-Air in 1982. Thereafter, Maytag maintained Jenn-Air's two-step distribution system even though Maytag generally relied on a "one-step" distribution system, whereby the manufacturer deals directly with retailers. From time to time, however, Maytag considered ending the two-step distribution system for Jenn-Air products so that Jenn-Air products would be handled in the same way as other Maytag merchandise. Nevertheless, Maytag and Jenn-Air personnel frequently told Jenn-Air distributors, including Mr. Clarkson, that Maytag was committed to two-step distribution with respect to Jenn-Air products, and that Maytag considered Jenn-Air distributors to be an important part of its team.

A series of one-year contracts spelled out the relationship between Clarkson Co. and Jenn-Air. The contracts were terminable by either party upon sixty days notice. Before 1989 the Clarkson Co./Jenn-Air relationship was mutually non-exclusive, with Clarkson Co. permitted to sell other companies' products and Jenn-Air permitted to appoint other distributors within Clarkson Co.'s territory. Over the years Clarkson Co.'s territory steadily grew, and in 1987 Jenn-Air proposed that it and Clarkson Co. enter into an exclusive relationship. Jenn-Air proposed that it grant Clarkson Co. additional territory and agree not to appoint any competing distributor within Clarkson Co.'s territory. In exchange Clarkson Co. would be required to agree to carry only

3

Jenn-Air products. Clarkson Co. asked for a five-to-ten year commitment from Jenn-Air, but Jenn-Air refused to enter into any contract for a term longer than one year and the deal fell through. Clarkson Co., however, continued to distribute Jenn-Air products under their earlier non-exclusive arrangement, and Clarkson Co. and Jenn-Air entered into another one-year non-exclusive contract in 1988.

In 1987 and 1988 Jenn-Air began to sell its products directly to the nationally-known retailer, Sears, thereby introducing a partial one-step distribution system. At a distributors' meeting on March 20, 1989, Jenn-Air told its distributors (including Mr. Clarkson), that even though Jenn-Air independent distributors were an important part of Jenn-Air's overall marketing strategy, sales to Sears would be handled without any distributor involvement. The distributors were told that Sears would be handled as a "direct house account," with products being delivered to Sears directly from Jenn-Air's factories and warehouses in Indiana, rather than from local distributors' warehouses. In addition, distributors would have no responsibility to service products sold through Sears.

One week later Clarkson Co. agreed to an "exclusive" arrangement with Jenn-Air. Three annual contracts governing the period from March 27, 1989, to May 12, 1992, contained language like the following (taken from the 1991 contract):

> Distributor [Clarkson Co.] agrees to purchase for resale Jenn-Air brand products exclusively. Company [Jenn-Air] agrees to appoint Distributor as its exclusive Distributor in the area of marketing responsibility [described] and agrees that it shall appoint no other Distributor in such area. Company shall sell to Distributor such Jenn-Air brand home appliances and accessories for the same, as Distributor will order and purchase, provided that the item ordered has been made available by Company for general sale to its other Distributors and in the judgement [sic] of Company it is appropriate to market it in the area herein described. . . . <u>Company</u>

4

> reserves the right to sell or service directly any or all of its products within the area of Distributor's sales responsibility.

(Emphasis supplied.)

On May 12, 1992, Clarkson Co. and Jenn-Air signed a new one-year contract. With the new contract, their last, they ended their exclusive arrangement and returned to their pre-1989 non-exclusive relationship. At that time, Clarkson Co. began to sell General Electric products.

Each annual contract, including the "exclusive" contracts, also contained language like the following (taken from the 1992 non-exclusive contract):

> This Agreement supersedes all previous agreements covering this distributorship. There are no agreements, written or oral, as to the terms and conditions of the distributorship except those contained herein and it is expressly understood by [Clarkson Co.] that no subsequent agreement modifying or altering the terms thereof shall bind [Jenn-Air] unless in writing, duly signed by an officer or Director of Sales of [Jenn-Air] at Indianapolis. Indiana, U.S.A.

Between April and June 1992 Clarkson Co. ordered and received a large amount of goods from Jenn-Air. At the time Clarkson Co. had no ability to pay for them, and Mr. Clarkson had withdrawn an application for a letter of credit from his bank and allowed his existing letter of credit to expire. He used proceeds from the sales of the Jenn-Air goods to buy General Electric merchandise. On June 15, 1992, Mr. Clarkson announced that Jenn-Air should communicate with him only through counsel. Two days later Clarkson Co. filed suit, alleging that Jenn-Air falsely told its distributors that it was intending to maintain the two-step distribution system, even though Jenn-Air was plotting the end of the system. On July 6, 1992, Jenn-Air notified Clarkson Co. that it was invoking their contract's sixty-day termination provision. Jenn-Air announced the end of its two-step distribution system on August 24, 1992.

5

II.

Clarkson Co.'s fraud claim is without merit because Clarkson Co. got exactly what it bargained for: a series of one-year distributorship contracts. Clarkson Co. continued to enter into a series of one-year contracts even after Jenn-Air expressly refused to agree to a longer-term commitment. Here, Jenn-Air officials said nothing that could reasonably be construed as an intention to transform what is clearly a series of one-year contracts into a long-term agreement. Regardless of any general statements Jenn-Air officials may or may not have made to Mr. Clarkson, when the smoke clears it is the negotiated, written documents that must govern this business relationship. Florentine Corp. v. PEDA I, Inc., 339 S.E.2d 112, 114 (S.C. 1985); Woodward v. Todd, 240 S.E.2d 641, 643 (S.C. 1978); see also Call Carl, Inc. v. BP Oil Corp., 554 F.2d 623, 630 & n.6 (4th Cir.) (applying Maryland law), cert. denied, 434 U.S. 923 (1977).

Jenn-Air did exactly what the written contract required it to do. Jenn-Air maintained its two-step distribution system for the entire time it and Clarkson Co. had a contractual relationship, and it did not end the two-step system until after Clarkson Co. filed suit (at which time Clarkson Co. was a non-exclusive distributor). Clarkson Co. and Jenn-Air were sophisticated business parties dealing at arm's length, and neither had any duty to disclose future business intentions to the other. Cheney Bros., Inc. v. Batesville Casket Co., 47 F.3d 111, 114-15 (4th Cir. 1995) (applying South Carolina law). The district court correctly granted Jenn-Air judgment as a matter of law on Clarkson Co.'s fraud claim.

III.

The district court also correctly granted Jenn-Air judgment as a matter of law on Clarkson Co.'s claims for breach of contract.

The contracts provide for Indiana law to apply, and because the contracts were for the sale of goods, the Indiana Uniform Commercial Code governs. Moridge Mfg. Co. v. Butler, 451 N.E.2d 677, 680 (Ind. Ct. App. 1983).

6

A.

Clarkson Co. claims that Jenn-Air breached its duty of good faith and fair dealing. "Every contract or duty within[the Uniform Commercial Code] imposes an obligation of good faith in its performance or enforcement." Ind. Code § 26-1-1-203 (Ind. U.C.C. § 1-203). This claim fails for the same reason that Clarkson Co.'s fraud claim fails.

The parties' agreements expressly provided that each contract would extend for only one year and that either party could terminate their relationship upon sixty days notice. The "duty of good faith cannot override or modify explicit contractual terms." Riggs Nat'l Bank of Washington, D.C. v. Linch, 36 F.3d 370, 373 (4th Cir. 1994) (interpreting federal Equal Credit Opportunity Act). Furthermore, we are persuaded by the Seventh Circuit's opinion in Vaughn v. General Foods Corp., 797 F.2d 1403, 1412-14 (7th Cir. 1986), cert. denied, 479 U.S. 1087 (1987), that Indiana courts would not find a breach of the duty of good faith and fair dealing here. That case held that a franchisor has no duty to reveal its plans to terminate a franchisee. Finally, as we stressed earlier, the 1992 non-exclusive contract was not terminated until after Clarkson Co. filed suit. Jenn-Air did not act in bad faith.

B.

Clarkson Co. next argues that Jenn-Air breached the exclusive contracts by appointing Sears to be a distributor in territory that by the terms of the written contracts was to have been exclusive to Clarkson Co.

We begin by noting that the contract reserved to Jenn-Air "the right to sell or service directly any or all of its products within the area of [Clarkson Co.'s] sales responsibility." The question, then, is whether Jenn-Air's sales to Sears fall within this exception to the exclusivity agreement. We believe they do, and that the Sears/Jenn-Air relationship is best understood as a direct service and sales relationship, rather than as a distributorship relationship.

Clarkson Co. entered into the exclusive contract after Jenn-Air announced how Sears sales would be handled. By knowing of the

7

Sears/Jenn-Air relationship, by knowing the nature of that relationship, by knowing that the relationship would continue, and by renewing its own contract with Jenn-Air twice, Clarkson Co. acquiesced in letting Jenn-Air sell directly to Sears. See Ind. U.C.C. § 2-208(1) ("course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement"); Ind. U.C.C. § 2-208(3) ("course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance"); see also Moody v. McLellan, 367 S.E.2d 449, 451 (S.C. Ct. App. 1988) ("if at the time the contract was entered one party understood the agreement in a particular sense, and the other party knew it to be so understood, then the undertaking is to be taken in that sense, if it is compatible with the language used"); cf. Ind. U.C.C. § 2-607(3)(a); Courtesy Ents., Inc. v. Richards Labs., 457 N.E.2d 572, 579 (Ind. Ct. App. 1983) ("Ordering additional goods without indicating dissatisfaction with the product is unreasonable conduct for one seeking to assert a breach of warranties of quality.").

Even if the Sears/Jenn-Air relationship violated Clarkson's right to an exclusive distributorship, Clarkson waived any right it may have had to challenge Jenn-Air's allegedly wrongful conduct. If the non-breaching "party after the discovery of the breach . . . reaffirms the original contract without giving any notice of his intention to rely on its exact terms, he has waived his right to recover for such failure to perform." White v. First Fed. Sav. & Loan Ass'n of Atlanta, 280 S.E.2d 398, 400 (Ga. Ct. App. 1981). Because Clarkson renewed its "exclusive" contract with Jenn-Air twice, Jenn-Air's sales to Sears were not improper.*

IV.

Clarkson Co.'s final claim is under SCUTPA, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a). This claim was disposed of on summary judgment. We agree

_____

*We have fully considered Clarkson Co.'s remaining breach of contract claims, and we conclude that they too are without merit. The evidence Clarkson Co. presented at trial did not prove any breach of contract.

8

with the district court that Clarkson Co.'s SCUTPA claim is barred for lack of evidence of harm to any public interest.

SCUTPA is primarily intended "to control and eliminate `the large scale use of unfair and deceptive trade practices within the State of South Carolina.'" Noack Ents., Inc. v. Country Corner Interiors of Hilton Head Island, Inc., 351 S.E.2d 347, 349 (S.C. Ct. App. 1986) (quoting Note, Consumer Protection and the Proposed "South Carolina Unfair Trade Practices Act," 22 S.C. L. Rev. 767, 787 (1970)). Thus, a plaintiff may not recover under SCUTPA unless the defendant's allegedly wrongful conduct implicates some public interest. Id. at 350.

> While every private dispute doubtless has remote public ramifications, these cannot be held to satisfy the element of injury to the public interest which is a prerequisite to any recovery under [SCUTPA]. Were the rule otherwise, every ordinary commercial dispute would become a candidate for the extraordinary remedies provided by the Act.

Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc., 974 F.2d 502, 507-08 (4th Cir. 1992).

Here, Clarkson Co. has alleged no harm to the citizenry of South Carolina at large. Its claim relates only to its private business relationship with Jenn-Air. Clarkson Co. claims to be wearing the mantle of other distributors harmed by the termination of the two-step system, but there is no evidence that any of those distributors are South Carolina citizens. Nor did Clarkson Co. come forward with any evidence that elimination of the two-step system led to higher prices for kitchen appliances within South Carolina. "South Carolina courts have consistently rejected speculative claims of adverse public impact and required evidentiary proof of such effects." Omni Outdoor Advertising, 974 F.2d at 507. The district court noted, and we are inclined to agree, that if elimination of the two-step system did anything, it reduced prices and improved product availability. Clarkson Co. did not meet its burden of coming forward with sufficient evidence of adverse public impact.

9

V.

The district court is affirmed.

AFFIRMED

10