**MORIDGE MANUFACTURING COMPANY,**
Defendant-Appellant,

v.

**Henry BUTLER, d/b/a Henry Butler Equipment Sales, Plaintiff-Appellee.**

No. 3–182A16.

Court of Appeals of Indiana,
Third District.

July 20, 1983.

Arthur A. May, May, Oberfell, Helling, Lorber, Campiti & Konopa, South Bend, for defendant-appellant.

James R. Fisher, Ice, Miller, Donadio & Ryan, Indianapolis, for plaintiff-appellee.

GARRARD, Judge.

Moridge Manufacturing Company (Moridge) is a Kansas corporation engaged in the manufacture and sale of grain dryers and related parts. For several years Butler acted as a distributor for Moridge in Indiana. In 1977 Moridge notified Butler that it would terminate his distributorship on December 31, 1977. When Moridge then refused to honor an order placed by Butler on December 23rd, Butler sued for the loss

of his potential profits. The case was tried to the court and findings and conclusions were entered. The court found for Butler on his claim and allowed Moridge a set-off for money found due it from Butler.

Moridge appeals contending the court erred in determining that it breached a duty to ship the grain dryers ordered in December, in not entering a separate judgment for Moridge on its counterclaim, and in awarding a special 2% discount on pricing structure. Butler cross appeals asserting he was entitled to pre-judgment interest.

## I.

The evidence at trial disclosed that in 1971 Butler approached Elbert Guyer, then principal owner and operating officer of Moridge, about the possibility of Butler becoming Moridge's distributor in Indiana. As a trial venture Butler purchased nine dryers and was given the distributor's discounted price.

In early 1972 Butler met with Stanley Guyer, manager of Moridge's plant at Moundridge, Kansas. The parties orally agreed that Butler would be the exclusive dealer for Moridge products in northern Indiana and Michigan. At some time after this meeting Butler requested a written distributorship agreement and one was submitted by Moridge. Butler did not execute the agreement, apparently because it contained a provision that he initially purchase ten dryers when he had only purchased nine.

The written proposal named Butler the exclusive distributor for his area, called upon him to use his best efforts to sell, service and promote the sale of Moridge products, and precluded him from handling competing products during its term. The proposal provided that it was for an initial term of one year and would continue thereafter until either party gave the other thirty days written notice of cancellation.

Interest in reducing the agreement to writing apparently lapsed after this initial effort. However, Butler proceeded to act as Moridge's distributor in the assigned area for the ensuing six years. Butler would order dryers and Moridge would ship them and accord Butler its distributor discounts. During this time Butler did not receive acknowledgments of his orders. If there was a problem, however, so that the order would not be shipped promptly Moridge would advise him by telephone. Invoices were not always sent with the merchandise, and sometimes they arrived before the shipment. Moridge also paid a portion of Butler's advertising expenses when the Moridge logo was used in the advertisement and accepted returns of defective parts under warranty. The parties acted generally as though the written agreement were in effect.

Then on December 8, 1977, Butler received a letter from Moridge dated November 29 and postmarked December 5 advising him that Moridge would terminate his distributorship thirty (30) days from December 1. On December 23 Butler ordered thirty-five (35) dryers. On January 19, 1978 Moridge sent Butler a statement of account showing a past due balance of $12,712.01 and advising him that the account would have to be made current for the company to consider his order. Butler promptly responded proposing that he retain his parts inventory on hand and be permitted to return them for full credit in two years. He did not pay his account with Moridge but indicated he would do so when the parts "problem" was worked out. On February 22 Moridge instructed Butler to make his purchases through Moridge's new distributor, and on March 20 by letter from counsel advised Butler it was declining his offer to purchase dated December 23, 1977. This litigation followed.

The trial court entered special findings determining, *inter alia,* that a contract between the parties existed between 1971 and December 31, 1977; that Moridge was obligated to sell its dryers to Butler at the established distributorship discount rates, and that Moridge breached and repudiated its contract. The court also found that Moridge's letter to Butler of January 19, 1978 was the first demand for payment of those invoices for parts and that under the

parties' agreement and course of dealing, the parts invoices were not due until demand was made. The court determined that failure to pay the account as demanded in view of the parties' prior history of determining and making adjustments was not a justification for Moridge's refusal to fill the order. The court then determined Butler's lost profit from Moridge's refusal to fill the order, found Moridge entitled to a set off for the account due it, and awarded Butler judgment for $19,166.93.

Moridge contends that the determination of its basic liability was error because there was at most an at-will arrangement, there was no mutuality of obligation, and Butler's order was merely an offer to purchase. It contends that in any event it was justified in refusing the order because of Butler's delinquent account. In essence it contends that as a matter of law the court could view the dealings between Moridge and Butler as no more than a series of isolated transactions since no written agreement was executed by the parties and Butler was not required to purchase a specific number of driers during any given year. We find that Moridge's arguments ignore both the spirit and the express concepts of the Uniform Commercial Code.

■ Although most distributorship agreements are more than a sales contract, courts have not hesitated to apply the UCC to cases involving them. *Corenswet, Inc. v. Amana Refrigeration, Inc.* (5th Cir.1979), 594 F.2d 129; *Rockwell Engineering Co. v. Automatic Timing & Controls Co.* (7th Cir. 1977), 559 F.2d 460; *Apache Trailer Sales, Inc. v. Redman Industries, Inc.* (1977), 117 Ariz. 504, 573 P.2d 904. Under the Indiana act the sales article applies to transactions in "goods." IC 26–1–2–102. It is not subject to dispute that the subject of their dealings were "goods," IC 26–1–2–105, or that both were "merchants" within the contemplation of the act. IC 26–1–2–104.

Accordingly, pursuant to IC 26–1–2–204:

"(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

\* \* \* \* \* \*

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

■ In determining whether a contract was made and, if so, its terms, the court was entitled to look both to any course of dealing between the parties, IC 26–1–1–205, and to their course of performance, IC 26–1–2–208.

From these provisions it seems clear that the court could properly have found upon the evidence before it the existence of a valid contract.

■ We need not address Moridge's assertion that such a finding would violate the statute of frauds, IC 26–1–2–201, since this was an affirmative defense that Moridge failed to plead in the trial court and has therefore been waived.[1] Indiana Rules of Procedure, Trial Rule 8(C); *Lawshe v. Glen Park Lumber Co.* (1978), 176 Ind.App. 344, 375 N.E.2d 275.

■ Moridge contends the alleged contract was unenforceable as lacking in mutuality. It cites *International Shoe Co. v. Lacy* (1944), 114 Ind.App. 641, 53 N.E.2d 636. We distinguish that case because unlike the facts there Butler agreed both to use his best efforts to sell Moridge's products and to refrain from selling any competing product line. Those detriments constitute a sufficient consideration to avoid the claim of lack of mutuality. *Corenswet, Inc. v. Amana Refrigeration, Inc.* (5th Cir.1979), 594 F.2d 129; *California Wine Ass'n v. Wisconsin Liquor Co.* (1963), 20 Wis.2d 110, 121 N.W.2d 308; *Accord, Advanced Copy Prod-*

1. Neither does it appear that the defense was actually litigated at trial or asserted in the motion to correct errors.

*ucts, Inc. v. Cool* (1977), 173 Ind.App. 363, 363 N.E.2d 1070.[2]

◼ The unsigned contract provided for termination upon 30 days written notice. Moridge's actual notice of termination sent to Butler stated that termination would not occur until December 31, 1977. IC 26–1–2–309(3) provides that termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable. Moreover, it must be recalled that IC 26–1–1–203 provides that "[e]very contract or duty within this act imposes an obligation of good faith in its performance or enforcement." The court did not err in determining that the distributorship agreement was still in force on December 23, 1977.[3]

◼ Finally, we agree that under the evidence the trial court could properly determine, as it did, that Moridge's refusal to ship because of the account due from Butler was pretextual. The evidence supports the finding of "a course of dealing" (more accurately, a course of performance); that "the

parts invoices were not due until demand was made, although interest was owed on bills ... not paid within thirty days...." We cannot say the finding was clearly erroneous.[4] Moridge failed to carry its burden of proving justification for its breach.

◼ The court's determination that Moridge breached a duty to fill the order was not contrary to law.[5]

## II.

◼ The trial court found for Butler on his principal claim and also found an amount due Moridge on its counterclaim. The court allowed the latter amount as a set off and entered judgment for Butler for the net difference. Moridge now claims it was entitled to have a separate judgment entered in its favor for the amount found due it. The argument is specious. Trial Rule 13(C) plainly and clearly provides:

> "A counterclaim may or may not diminish or defeat the recovery sought by the opposing party."

Furthermore, subsection (M) of the rule authorizes ordering credits against a judgment and includes counterclaims within the definition of credits. The Civil Code Study

2. IC 26–1–2–306(2) provides "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."

3. There has been no contention that the size of Butler's order was unreasonable. *See* IC 26–1–2–306.

4. IC 26–1–2–609 provides:
   "(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
   (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.
(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty (30) days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."
To the extent Moridge's letter expressed "insecurity" there was a lack of evidence that its feeling was reasonable according to commercial standards or that under the parties' course of performance Butler's prompt reply did not supply adequate assurance.

5. We note that the request for findings did not invoke Trial Rule 52(A) since it was made orally after the evidence commenced. *Greiner v. Greiner* (1979), 179 Ind.App. 61, 384 N.E.2d 1055. Thus, matters not expressly found are treated as having been determined on a general finding. *Hunter v. Milhous* (1973), 159 Ind. App. 105, 305 N.E.2d 448.

Commission comments agree. *See 2 Harvey, Indiana Practice* 10, 11.

The court properly utilized the amount found due on the counterclaim to reduce the amount found due on Butler's claim.

### III.

■ Moridge asserts that it was error for the court to find that Butler was entitled to a 2% cash discount credit for orders placed after June 1 each year and paid for within ten (10) days after receipt of shipment. Again we disagree. The evidence supporting the judgment establishes that Butler was told by letter of June 15, 1972 from Moridge that he would receive such a discount in addition to the regular distributor's discount, and no cancellation or termination of that cash discount was ever communicated to him by Moridge. The court's finding that Butler was entitled to the 2% cash discount is not clearly erroneous. (A portion of Moridge's argument on this issue is premised on its earlier contention that no valid contract existed. That portion fails with our resolution of that contention, *supra.*)

### IV.

In his cross appeal Butler contends the court should have awarded pre-judgment interest.

The statutory provision concerning pre-judgment interest, IC 24–4.6–1–103, provides:

"Interest at the rate of eight percent (8%) per annum shall be allowed:

(a) From the date of settlement on money due on any instrument in writing which does not specify a rate of interest and which is not covered by IC 1971, 24–4.5 or this article;

(b) And from the date an itemized bill shall have been rendered and payment demanded on an account stated, account closed or for money had and received for the use of another and retained without his consent."

In this case the parties correctly acknowledge that the statute does not apply.

■ Indiana has, however, long held that this statute is not the exclusive authority for pre-judgment interest. *Portage Ind. Sch. Constr. Corp. v. A.V. Stackhouse Co.* (1972), 153 Ind.App. 366, 287 N.E.2d 564.

A line of authority developed following *New York, C. & St. L. Ry. Co. v. Roper* (1911), 176 Ind. 497, 96 N.E. 468 permitting recovery for loss of use measured by the interest rate in tort claims where the amount of damages was liquidated or readily ascertainable by mathematical computation or reference to readily available market value data. *See Fort Wayne National Bank v. Scher* (1981), Ind.App., 419 N.E.2d 1308.

Applying Indiana law the Seventh Circuit found the rule permitting recovery of pre-judgment interest as damages should apply in a claim for breach of a stock option contract. *Rauser v. LTV Electrosystems* (7th Cir.1971), 437 F.2d 800. The court's rationale was cited with approval by this court in *Portage, etc., supra.* Furthermore, while there is a split in authority, the modern view is to permit recovery. *See* 67 *Am.Jur.2d, Sales* Section 669; Annot., 4 *A.L.R.2d* 1388. Section 354, *Restatement of Contracts (2d)* provides:

"(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled."

In the present case Butler's claim, as we have already seen, is governed by the Uniform Commercial Code. He did not elect to cover, as he might have done under IC 26–1–2–712. His claim for damages was thus governed by IC 26–1–2–713, which provides:

(1) Subject to the provisions of this article [chapter] with respect to proof of market price (section [26–1–]2–723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and

the contract price together with any incidental and consequential damages provided in this article [chapter] (section [26–1–]2–715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender, or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival. [Acts 1963, ch. 317, Section 2–713, p. 539.]"

■ Certainly in the context of this litigation there was no difficulty in ascertaining the market price of the ordered dryers at the time when Butler learned that Moridge had repudiated. The damage claim was one susceptible on that basis to an award of pre-judgment interest.

We acknowledge that the statutory definitions of incidental and consequential damages do not expressly mention such an award.[6] Yet the general concept of the code is to permit the recovery of full compensation by an injured party.

As consequential damage one may reasonably argue that delay in payment caused a loss resulting from the general needs of the buyer of which the seller had reason to know. But even if we hesitate to go so far, IC 26–1–1–103 reminds us that except where displaced by particular provisions of the code, "the principles of law and equity . . . or other validating . . . cause shall supplement its provisions."

We conclude that the claim was one upon which pre-judgment interest was appropriate.

Moridge finally argues, however, that even if pre-judgment interest might have been awarded, it was a matter within the trial court's discretion and we should not reverse.

A number of Indiana cases have so characterized the decision to award pre-judgment interest. *See Fort Wayne National Bank v. Scher* (1981), Ind.App., 419 N.E.2d 1308 where several such cases are cited. The Supreme Court considered this question in *Roper, supra* and stated:

"The law dispenses no favors, and jurors should mete out equal and exact justice, and should not have the right to allow or refuse interest as one of the elements of just compensation. . . ."

176 Ind. at 509, 96 N.E. 468. We agree, as we did in *Scher.* The court erred in failing to award pre-judgment interest.

Accordingly, upon Butler's cross appeal we reverse and remand for the entry of pre-judgment interest in addition to the other sums found due. In all other respects the judgment is affirmed.

Affirmed in part, reversed in part.

HOFFMAN, P.J., and STATON, J., concur.

6. "26–1–2–715 [19–2–715]. Buyer's incidental and consequential damages.

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include
(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
(b) injury to person or property proximately resulting from any breach of warranty. [Acts 1963, ch. 317, Section 2–715, p. 539.]"