**BEST DISTRIBUTING COMPANY, INC., Appellant–Defendant,**

v.

**SEYFERT FOODS, INC., Appellee–Plaintiff.**

No. 49A04–9802–CV–98.

Court of Appeals of Indiana.

Aug. 6, 1999.

V. Samuel Laurin, George T. Patton, Jr., Monique Winkler, Bose McKinney & Evans, Indianapolis, Indiana, Attorneys for Appellant.

Dale W. Eikenberry, John D. Waller, Wooden & McLaughlin, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

SHARPNACK, Chief Judge

This case comes to us on interlocutory appeal. Best Distributing Company, Inc. ("Best") appeals the trial court's grant of partial summary judgment in favor of Seyfert Foods, Inc. ("Seyfert"). Best raises four issues which we restate as:

1) whether Best's purchase, maintenance, and replacement of display equipment or its rental of a warehouse constitute a franchise fee as that term is used in Ind.Code § 23–2–2.5–1;

2) whether Seyfert and Best had a fiduciary relationship such that a duty of good faith and fair dealing applies to the termination of their relationship;

3) whether Seyfert owed Best a duty of good faith under the Indiana Uniform Commercial Code; and,

4) whether Seyfert's thirty day notice of the termination of its relationship with Best was reasonable.

We affirm.

The undisputed facts follow. Best entered into an oral agreement with Seyfert in 1953 to purchase and resell Seyfert's snack foods to retailers. During the course of the relationship, which was never expressed to be for a specific period, Best and Seyfert never executed a written agreement. On April 24, 1995, Seyfert terminated its relationship with Best.

Seyfert filed a complaint against Best seeking damages based on money allegedly owed by Best to Seyfert under their agreement and damages based on Best's alleged breach of the agreement. Best counterclaimed seeking damages based upon claims that Seyfert and Best had a franchise relationship that Seyfert unlawfully terminated and that Seyfert acted in bad faith prior to its termination of the relationship with Best. In the alternative, Best claimed damages based upon Seyfert's breach of alleged fiduciary duties to Best, Seyfert's breach of the duty of good faith and fair dealing, and Sey-

fert's failure to give Best reasonable notice of the termination of the parties' relationship.

Seyfert filed a motion for partial summary judgment. Seyfert sought summary judgment, claiming as a matter of law that: there was no franchise relationship between Best and Seyfert; there was no fiduciary relationship between Best and Seyfert; there is no separate claim for relief under Indiana law for breach of an obligation to deal in good faith; and its thirty day termination notice was reasonable.

The trial court held a hearing on Seyfert's motion for partial summary judgment. In granting Seyfert's motion for partial summary judgment, the trial court's order stated that 1) there were no genuine issues of material fact in dispute and as a matter of law there was no basis to find a franchise relationship between Best and Seyfert because there was no franchise fee paid directly or indirectly by Best; 2) Best's affirmative defense claiming illegal matters arising out of a franchise relationship failed because the court found that no franchise relationship existed; [1] 3) there was no genuine issue of material fact and as matter of law there was no fiduciary relationship between Seyfert and Best; 4) that as matter of law there is no separate claim for relief under Indiana law for an alleged breach of an obligation to deal in good faith between a supplier and distributor; and 5) there were no genuine issues of material fact and as a matter of law the termination of Best with a thirty day notice was not unreasonable.

## STANDARD

■ The issue raised is whether the trial court erred in granting partial summary judgment. When we review a trial court's decision on a motion for summary judgment, we are bound by the same standard as the trial court. *Ayres v. Indian Heights Volunteer Fire Dep't, Inc.*, 493 N.E.2d 1229, 1234 (Ind.1986); *see* Ind. Trial Rule 56. The appellant bears the burden of proving the trial court erred in determining that there were no genuine issues of material fact and that

---

1. On appeal, Best does not discuss this affirmative defense. Therefore, we do not address it in this opinion.

the moving party was entitled to judgment as a matter of law. *Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 434 (Ind.1993). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmovant. *Cowe v. Forum Group, Inc.,* 575 N.E.2d 630, 633 (Ind.1991). A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue. *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 318 (Ind.Ct.App. 1991).

■ On appeal, we scrutinize the trial court's determination to ensure that the non-prevailing party is not improperly denied its day in court. *Perryman v. Huber, Hunt & Nichols, Inc.,* 628 N.E.2d 1240, 1243 (Ind.Ct. App.1994), *trans. denied.* This court applies the same standard as does the trial court. *USA Life One Ins. Co. of Ind. v. Nuckolls,* 682 N.E.2d 534, 537 (Ind.1997). At the time of filing the motion or response, a party shall designate to the court all parts of the pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters on which it relies for purposes of the motion. T.R. 56(C). We consider only the materials designated to the trial court to determine whether there is a genuine issue as to any material fact and whether the moving party is entitled to a judgment as a matter of law. T.R. 56(C). We liberally construe all inferences and resolve all doubts in the nonmovant's favor. *Nuckolls,* 682 N.E.2d at 537.

## I. INDIRECT FRANCHISE FEE

Best asserts that it had a franchise relationship with Seyfert and that the Indiana franchise laws apply to that relationship. Seyfert claims that the franchise laws do not apply to its relationship with Best. There are three requirements that must be met to constitute a franchise under the Indiana franchise statute:

> "(a) 'Franchise' means a contract by which:
>
> (1) a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;
>
> (2) the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and
>
> (3) the person granted the right to engage in this business is *required to pay a franchise fee.*"

Ind.Code § 23–2–2.5–1(a) (emphasis added). However, only one of these requirements is at issue in this appeal. That is, whether Best paid a franchise fee to Seyfert. The trial court granted summary judgment in favor of Seyfert finding that there was no franchise relationship established because Best did not pay a direct or indirect franchise fee to Seyfert. Indiana Code § 23–2–2.5–1(i) defines franchise fee as follows:

> (i) " 'Franchise fee' means any *fee that a franchisee is required to pay* directly or *indirectly* for the right to conduct a business to sell, resell, or distribute goods, services, or franchises under a contract agreement, including, but not limited to, any such payment for goods or services."

(emphasis added).[2] Best admits that it did not pay a direct franchise fee to Seyfert. Instead, Best asserts that it paid an "indirect franchise fee" to Seyfert. Best claims that it paid an indirect franchise fee to Seyfert by its purchase, maintenance, and replacement

---

2. "Franchise fee" does not include:
 (1) the payment of a reasonable service charge to the issuer of a credit card by an establishment accepting or honoring the credit card;
 (2) amounts paid to a trading stamp company by a person issuing trading stamps in connection with the retail sale of goods or services; or
 (3) the purchase or agreement to purchase goods at a bona fide wholesale price.
 I.C. § 23–2–2.5–1(i).

of racks and end caps [3] over the course of the forty plus year relationship. Best also asserts that its construction of a new warehouse constituted an indirect franchise fee.[4]

 The determination of what constitutes an indirect franchise fee in the statute has not yet been made by an Indiana state court. In interpreting the language of a statute, we presume that words appearing in the statute were intended to have meaning, and we endeavor to give those words their plain and ordinary meaning absent a clearly manifested purpose to do otherwise. *Indiana Dept. of Human Services v. Firth,* 590 N.E.2d 154, 157 (Ind.Ct.App.1992), *trans. denied.* A statute should also be construed so as to ascertain and give effect to the intention of the legislature as expressed in the statute. *State v. Windy City Fireworks, Inc.,* 600 N.E.2d 555, 558 (Ind.Ct.App.1992), *adopted by,* 608 N.E.2d 699 (Ind.1993). In doing so, the objects and purposes of the statute in question must be considered, as well as the effect and consequences of such interpretation. *Id.*

The United States Court of Appeals for the Seventh Circuit has interpreted the meaning of "indirect franchise fee" under our franchise statute. *See Wright–Moore Corp.*

v. Ricoh Corp., 908 F.2d 128 (7th Cir.1990), *reh'g denied.*[5] In *Wright–Moore,* the Seventh Circuit noted that there was no definition given for "indirect" franchise fee in the Indiana statute and, therefore, the court focused on the policies underlying the franchise laws. *Id.* at 135. The Seventh Circuit stated that "[t]he purpose of most franchise laws is to protect franchisees who have unequal bargaining power once they have made a firm specific investment in the franchisor." *Id.* In addition, the Seventh Circuit stated that the central function of the franchise statutes is to prevent "suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting a brand." *Id.* (citations omitted). The court went on to explain that the reason for the franchise fee is to insure that only those entities that have made a *firm specific investment* are protected under the franchise laws, because if "there is no investment, there is no fear of inequality of bargaining power." *Id.* at 135–136 (emphasis added). The Seventh Circuit concluded that, therefore, alleged franchise fees must show evidence of *unrecoverable investment* in the distributorship by the distributee. *Id.* at 136 (emphasis added). We are satisfied that the analysis of the Seventh

---

3. "End Caps" are free standing, four sided racks placed at the ends of aisles in grocery stores.

4. Best claims in its brief that it was required to construct a warehouse. However, Best never constructed or owned the warehouse. Rather, Best's president owned the warehouse and leased it to Best.

5. In *Wright–Moore,* Wright–Moore maintained that it paid indirect franchise fees by way of payments for excess inventory, training, and ordinary business expenses. *Wright–Moore,* 908 F.2d at 135. The court noted that the term indirect franchise fee was given little definition in the statute and Indiana's franchise law has no legislative history. *Id.*

In considering excess inventory, *Wright–Moore* held that it could constitute an indirect franchise fee. *Id.* at 136. The court stated that a sales quota was not enough, the "quantity of goods must be so unreasonably large that it is illiquid." *Id.* The court held that costs incurred in training could be indirect franchise fees if they were "substantial and unrecoverable, locking the franchise into the franchisor." *Id.* With regard to the claim that business expenses constituted "indirect franchise fees," the court held that "unless

the expenses result in an unrecoverable investment in the franchisor, they should not normally be considered a fee." *Id.* The court noted that the bonafide wholesale exception confirms this. *Id.* The court stated that "[t]he statute defines a franchise fee as a fee paid for the right to do business, not as fees paid during the course of business." *Id.* (citing I.C. § 23–2–2.5–1(i)). The court held that each matter in *Wright–Moore* was fact specific and summary judgment was not appropriate on the franchisee issue. *Id.*

On appeal after remand, the Seventh Circuit held that Wright–Moore was not required by Ricoh to pay a franchise fee in the form of excess inventory through its agreement to purchase 1,200 copiers. *Wright–Moore Corp. v. Ricoh Corp.,* 980 F.2d 432, 436 (7th Cir.1992), *reh'g denied.* The argument failed because Wright–Moore resold almost all the copiers before it was required to make final payment for them. *Id.* Because Wright–Moore was not overstocked, the inventory did not constitute an indirect franchise fee. *Id.* The court held that the training expense was just a cost of doing business. Wright–Moore recovered its costs on training because the training its dealers received on Ricoh models enabled them to service Ricoh copiers and other brands with little training. *Id.*

Circuit in *Wright–Moore* is correct and we apply it in our resolution of this case.[6] *See generally id.*

## A. Standard

■ Here, Best must show that it made an unrecoverable, firm specific investment in Seyfert by the payment of the alleged fees. *See id.* at 136. In addition, our statute plainly requires that the fee be "required ... for the right to conduct a business to sell, resell, or distribute goods, services or franchises under a contract agreement ..." I.C. § 23–2–2.5–1(i). Having considered the policy and purposes behind the franchise laws and the plain language of our Indiana franchise statute we set forth the following test to determine whether an indirect franchise fee has been paid:

whether one party has made a:

1) required;

2) unrecoverable; and,

3) a firm specific investment in another party;

4) for the right to conduct a business to sell, resell, or distribute goods, services or franchises under a contract agreement.

*See* I.C. § 23–2–2.5–1; *Wright–Moore*, 908 F.2d at 135–136. If any of the above elements are absent, an indirect franchise fee will not be deemed established.

■ We note, however, that ordinary business expenses cannot be deemed franchise fees. *Wright–Moore*, 908 F.2d at 136. "The

statute defines a franchise fee as a fee paid for the *right* to do business, not as fees paid during the course of business." *Id.* (original emphasis) (citing I.C. § 23–2–2.5–1(i) & *RJM Sales & Marketing v. Banfi Products Corp.*, 546 F.Supp. 1368, 1373 (D.Minn.1982) (ordinary business expenses are not franchise fees)). In a recent case, *To–Am Equipment Co., Inc. v. Mitsubishi Caterpillar Forklift America,* the Seventh Circuit, again, stated that in Indiana, ordinary business expenses cannot qualify as franchise fees because "franchise fees" must be unrecoverable investments. *To–Am Equipment Co., Inc. v. Mitsubishi Caterpillar Forklift America,* 152 F.3d 658, 663 (7th Cir.1998), *reh'g denied.*[7] We agree.

## B. Analysis

■ We must first determine whether Best has shown that its payments for the purchase, maintenance, and replacement of racks and end caps used to display products in the stores[8] and its rental of a warehouse constitute an indirect franchise fee or whether the costs are ordinary business expenses. To resolve this issue, we must decide whether Best's alleged costs were required, unrecoverable, and a firm specific investment in Seyfert for the right to conduct business.

Best states that Seyfert required it to supply customers with display racks and end caps, and to replace those that were deteriorating in order to display Seyfert's goods.[9]

---

6. In addition to arguing under *Wright–Moore,* Best utilizes other cases including *Implement Service, Inc. v. Tecumseh Products Co.,* 726 F.Supp. 1171 (S.D.Ind.1989) and *Digital Equipment Corp. v. Uniq Digital Technologies,* 73 F.3d 756 (7th Cir.1996) to argue that it paid Seyfert an indirect franchise fee. We have reviewed the standards these cases used and conclude that *Wright–Moore* is the most compatible with our interpretation of I.C. § 23–2–2.5–1(i). Therefore, we decline to discuss each of these cases in this opinion.

7. In *To–Am Equipment,* the Seventh Circuit discussed the "unrecoverable investment" rule in *Wright–Moore* and distinguished the Indiana definition from the Illinois definition of "indirect franchise fee." The Seventh Circuit noted that 1) the question of whether alleged business expenses are franchise fees is a highly fact specific question and the court in *Wright–Moore* rejected summary judgment 2) the language of the

Indiana statute was more broad than Illinois, and 3) Indiana had no administrative regulations broadly defining indirect franchise fees. *See To–Am Equipment,* 152 F.3d at 663.

8. These stores were owned by third parties including, but not limited to, Kroger, Marsh, Cub, Meijer, and Village Pantry.

9. Under Appellate Rule 8.3(A)(5) the appellant is required to provide "[a] statement of the facts relevant to the issues presented for review, with *appropriate references to the record.*" (emphasis added). Appellate Rule 8.3(A)(7) requires the appellant to provide, in it's argument, *citations to the parts of the record relied upon.* Here, Best's citation to its Brief in Opposition to Plaintiff's Motion for Summary Judgment that it submitted to the trial court is inadequate. The appropriate reference to the record when appealing summary judgment are to the *record cites* where the de-

Best maintains that it could not act as a seller of Seyfert's goods without purchasing racks and end caps because without them, it could not sell and distribute its products and thus, it would not make money. Therefore, Best states that it was "required" to purchase the racks and end caps. The evidence Best designates to support its assertion merely shows that Best did purchase and install racks, not that Seyfert "required" Best to do so. It appears that purchasing racks is an inherent requirement of being in this type of distributorship. The designated evidence indicates that the requirement is imposed by the custom and nature of the business, not by Seyfert. The retailers, such as supermarkets, provide space for the distributor to display its goods advantageously, but the distributor is expected to provide the racks without cost to the retailer. The racks deteriorate over time and need to be replaced. As such, the racks and end caps do not meet the requirement prong of the franchise fee test. *See* I.C. § 23–2–.25–1(i).

Next, Best asserts that Seyfert required it to build a new warehouse. However, Best did not build the warehouse. Rather, its president, Constance Sharp built it and leased it to Best. After reviewing the record we find that designated evidence shows that Seyfert "wanted" Best to build a warehouse. Sharp testified that she "didn't have any choice" but to expand the market so she "wasn't going to have any choice but to build [the warehouse]." Record, pp. 489–490. Best maintains that absent Seyfert's requirement, Best would not have built the warehouse. It is clear from the designated evidence that Seyfert did not "require" that Best build a warehouse. It appears that Sharp believed that she needed to build another warehouse to expand her business, but her subjective "belief" that she had to build it cannot be turned into a requirement by Seyfert. As such, the costs associated with the warehouse at issue do not meet the element of "required." *See* I.C. § 23–2–2.5–1(i).

Because Seyfert did not require Best to purchase racks and end caps and to rent a warehouse the statutory requirement of I.C. § 23–2–2.5–1(i) is not met. Therefore, the costs associated with the racks, end caps, and warehouse cannot be deemed indirect franchise fees.

Assuming, arguendo, that Seyfert "required" Best to purchase racks, end caps, and pay rent for the use of a warehouse, we will discuss whether these costs were paid "for the right to conduct business" or whether they were "expenses paid in the course of business." *See* I.C. § 23–2–2.5–1(i); *Wright– Moore*, 908 F.2d at 136. Best claims that for over forty years it invested a large sum of money in purchasing and replacing the display racks on which Seyfert's products were displayed for the right to conduct business. Best points out that Eugene Cawvey, one of Seyfert's sales and advertising managers testified that Best "invested" when it purchased the racks. Based on this, Best claims that its investment in racks was for the "right to conduct business" as a seller of Seyfert products, and as such, it paid a franchise fee indirectly to Seyfert under I.C. § 23–2–2.5– 1(i). However, we find that the racks and end caps were not investments for the right to conduct business.

The purchase and maintenance of display racks and end caps were ordinary business expenses. Business expenses do not give rise to an indirect franchise fee; therefore the expenses incurred by Best cannot be franchise fees. *Wright–Moore*, 908 F.2d at 136. The racks are similar to expenses for advertising costs, trucks, computer systems, and staff which can either be recovered by deducting them from its gross income or depreciating them over time. *See* I.R.C. §§ 162, 167. Cawvey testified that the racks were "a very necessary expense of the business." Record, p. 266. In addition, he testified that distributors providing racks to stores is basically a general practice in the industry. This designated evidence shows that the racks and end caps were ordinary business expenses [10] incurred in the course of

---

signed *evidence* is located. We note that the appellee properly cited to the record in its briefs.

**10.** "Business expense" is defined by Black's Law Dictionary as "[a]n expense incurred in connec-

tion with carrying on a trade or business, the purpose of which is the production of income. Such expenses are deductible in arriving at tax-

a distributorship business. *See Wright–Moore*, 908 F.2d at 136.

Best could recover the costs of the racks and end caps through the sales of the Seyfert's snack products. Best asserts that it could not recover the expenses of the racks and end caps through the sale of Seyfert products because Seyfert determined the retail price of every Seyfert product Best sold so it could not raise prices to recover the expenses of the racks. However, increasing the price of the product is not the only method of recovering costs. Best's use of the display racks promoted the sale of the snack products resulting in a potential to increase in the quantity of snack food products it sold, thus benefiting Best. Therefore, the costs associated with the racks and end caps were not unrecoverable investments in Seyfert. *See Wright–Moore*, 908 F.2d at 136. Instead, the costs were expenses incurred in the ordinary course of business. *See id.*

Next we consider whether payment of rent for the use of a warehouse is an expense paid "in the course of business." Best argues that the costs of constructing the warehouse are unrecoverable and that it did not need the warehouse. As we have already discussed, Sharp, Best's president, owned and leased the warehouse to Best.[11] As such, Best did not incur costs to construct the warehouse, it paid rent for the use of the warehouse. Rent paid by a business is a deductible ordinary business expense. *See* I.R.C. § 162(a)(3).[12] Because rent is deductible, Best could recover the costs of the rent through its yearly tax deductions. Best used the warehouse in the course of its distributorship business to store its racks and products as well as housing its office. In addition, the warehouse is still being used by Best in its distributing business. Therefore, we find that the rent paid by Best for the warehouse is an expense incurred in the ordinary course of business. *See Wright–Moore*, 908 F.2d at 136.

### C. Conclusion

Because we find, as a matter of law, that Best's costs for the racks, end caps, and warehouse were not required by Seyfert for the right to conduct a business, we hold that these costs do not constitute indirect franchise fees as a matter of law.[13] Instead, they are ordinary business expenses. *See id.* As such, we need not address whether the costs incurred by Best were firm specific investments[14] in Seyfert. Since the costs are not indirect franchise fees, we hold that Best was not a franchisee. *See id.*[15] As such, Best is

---

able income. IRC § 162." BLACK'S LAW DICTIONARY, p. 198 (West 1990).

11. Assuming arguendo, that Best did own the warehouse it could depreciate the cost of the warehouse as a capital asset. "There shall be allowed as a depreciation deduction [from gross income] a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-
　(1) of property used in trade or business, or
　(2) of property held for the production of income." I.R.C. § 167(a). *See* § 61 Gross Income.

12. "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including
　* * * *
　(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity ..." I.R.C. § 162(a)(3).

13. Although Best states that installation of a new computer system constituted an indirect franchise fee, it fails to develop any argument about the computer system in its briefs. Nonetheless, we find that computers are also ordinary business expenses.

14. Best contends that the sale of Seyfert's products constituted approximately ninety percent of Best's business and that therefore its investments were firm specific. Best asserts that unilateral termination of forty plus year relationship with Best evidences Best's unequal bargaining power. Unequal bargaining power alone does not constitute a franchise relationship. We decline to evaluate the bargaining power of Best or Seyfert here because, based on our analysis, the costs paid by Best were clearly ordinary business expenses, not indirect franchise fees. Even if there was unequal bargaining power here it would not change the outcome of this case.

15. Best argues that the warehouse is similar to the inventory requirement in *Wright–Moore* because Best transferred cash to Seyfert by building a new warehouse where it stored inventory sold to it by Seyfert. However, there was no requirement of a specific size of inventory by Seyfert and this is fatal to the *Wright–Moore* analysis. Seyfert asserts that Best is still using

not afforded the protection of the Indiana franchise laws.[16]

## II. FIDUCIARY DUTY, GOOD FAITH AND FAIR DEALING

 Next, we must determine whether, as a matter of law, a fiduciary relationship existed between Best and Seyfert. Best argues that Seyfert breached the fiduciary duty owed to Best and breached the corresponding duty of good faith and fair dealing. Our research and that of the parties has not uncovered any cases in Indiana that hold there is a fiduciary relationship between a distributor and distributee. However, in one of our cases we generally addressed fiduciary relationships in Indiana. *Peoples Trust v. Braun*, 443 N.E.2d 875, 879 (Ind.Ct.App. 1983). We held that when a relationship of trust and confidence exists between parties there is a fiduciary relationship. *Id.* In determining whether the facts of a specific case give rise to a fiduciary duty we stated the following:

"Although the existence of a confidential relationship depends upon the facts of each case, it can be generally stated that a confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. Not only must there be confidence by one party in the other, the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. Furthermore, it must be shown that the dominant party wrongfully abused the confidence by improperly influencing the weaker so as to obtain an unconscionable advantage."

*Peoples Trust,* 443 N.E.2d at 879 (quoting *Hunter v. Hunter,* 152 Ind.App. 365, 372, 283 N.E.2d 775, 779 (1972)) (citations omitted). However, when the parties involved are in an arm's length, contractual arrangement, the requisite fiduciary relationship may not be predicated on such an arrangement. *Knauf Fiber Glass, GmbH v. Stein,* 615 N.E.2d 115, 124 (Ind.App.Ct.1993), *rev'd in part on other grounds,* 622 N.E.2d 163 (Ind.1993) (citing *Comfax v. North Am. Van Lines,* 587 N.E.2d 118, 125–126 (Ind.Ct.App.1992)); *Mullen v. Cogdell,* 643 N.E.2d 390, 401, (Ind.Ct.App. 1994), *reh'g denied, trans. denied.*

Here although Seyfert may have been Best's main source of product to sell, both are experienced businesses and there is nothing in the record to indicate that their arrangement was anything other than openly and mutually agreed or that Seyfert had any unconscionable advantage. *See Peoples,* 443 N.E.2d at 879.

Best argues that its relationship with Seyfert was similar to the relationship between the trucking company and its major customer in *Knauf.* The relationship between the trucking company and its major customer in *Knauf* was that these parties were so closely intertwined that the trucking company was

---

the warehouse to distribute other products. Seyfert maintains that Best could sell the warehouse and turn the investment into cash. This differs from *Wright–Moore,* where the inventory was illiquid, and the payments for the inventory went directly to the seller. *See Wright–Moore,* 908 F.2d at 136. In *Digital,* the court noted the *Wright–Moore* rule that purchasing a large volume of inventory, only to have the product remain unsold for a large period of time, acts as a cash payment by transferring wealth from the buyer to the seller because 1) the buyer gets no benefit from the inventory, and 2) the seller earns interest from the earlier sale of the product *Digital,* 73 F.3d at 760. In *Digital* the court found that inventory which only languished for sixteen days was too small to be called a franchise fee. *Id.* The type of unrecoverable investment in the franchisor contemplated in *Wright–Moore* is different than the purchase and maintenance of display racks. The inventory in *Wright–Moore* was an excess inventory which bore no

reasonable relationship to a claim for reasonable and necessary business expenses and where there was no benefit whatsoever to the buyer. *See Wright–Moore,* 908 F.2d at 136. Additionally, here there was an unmistakable benefit to Best because without the racks Best could not sell and distribute its product and hence would make no money.

**16.** Best argues that if this court adopts a new standard for what constitutes an indirect franchise fee under Indiana law, it should have the opportunity to meet the new standard. We decline to give Best another opportunity here because the standard we have used is not new. It is simply a restatement of the Indiana franchise statute as applied by *Wright–Moore.* Both were available to and used by Best in its briefs. As such there is no reason to give Best another opportunity to meet this same standard.

like the major customer's private trucking fleet. *Knauf,* 615 N.E.2d at 124 (Ind.Ct.App. 1993). The major customer also loaned the trucking company $60,000 to help the company with its debts and cash flow. *Id.* Best asserts that the name Seyfert was synonymous with Best. Best directs us to designated evidence showing that in the beginning of the relationship, upon Seyfert's request, Best used Seyfert's name on its trucks. Best also points us to evidence that it used Seyfert's name on their checks. However, Best has not convinced us that the mere use of Seyfert's name on its trucks and checks constitutes evidence of a fiduciary relationship. Specifically, Best has not cited any authority that supports its argument that because it used Best's name its relationship was so "closely intertwined" that it created a fiduciary relationship. Rather, we find that Best's relationship with Seyfert was a typical business relationship involving arm's length negotiations. *See Knauf,* 615 N.E.2d at 124. Because we hold that there was not a fiduciary relationship, we need not address whether the thirty day notice breached a fiduciary duty to Best and a corresponding duty of good faith and fair dealing.

### III. GOOD FAITH UNDER THE INDIANA UNIFORM COMMERCIAL CODE

The next issue is whether Best has a separate claim under the Uniform Commercial Code for breach of a duty of good faith between Seyfert as a supplier and Best as a distributor. Best argues that *Moridge Mfg. Co. v. Butler* supports its contention that Indiana's U.C.C., Ind.Code § 26–1–1–203 creates a separate duty of good faith. *Moridge Mfg. Co. v. Butler,* 451 N.E.2d 677, 680 (Ind.Ct.App.1983). Seyfert contends that *Moridge* does not support Best's assertion. Seyfert agrees that I.C. § 26–1–1–203 applies to their distributorship agreement, but asserts that it does not provide an independent cause of action for breach of duty of good faith. We agree.

Indiana Code § 26–1–1–203 provides: "[e]very contract or duty within IC 26–1 imposes an obligation of good faith in its performance or enforcement." The comment to I.C. § 26–1–1–203 states that:

> "[t]his section *does not support an independent cause of action for failure to perform or enforce in good faith.* Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power. This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached."

(emphasis added).

We found no Indiana cases that reaffirm the comment to I.C. § 26–1–1–203. However, other jurisdictions have endorsed the rule that breach of good faith cannot be maintained as an independent cause of action. *See Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir.1992) (holding lack of good faith alone does not create cause of action), *reh'g denied; Frontier Fed. Sav. and Loan Ass'n v. Commercial Bank,* 806 P.2d 1140, 1142 (Okla.Ct.App.1990) (finding Oklahoma U.C.C. § 1–203, obligation of good faith, does not support an independent cause of action for breach in the absence of a contract or separate duty under the Oklahoma Commercial Code); *cf Morris v. Bank of Nevada,* 110 Nev. 1274, 886 P.2d 454, 457 n. 2 (1994) (holding that where plaintiff may have had a viable action against bank for breach of contract, but plaintiff's attorney failed to plead breach of contract, plaintiff's action for breach of implied covenant of good faith was not precluded).

Despite this, Best argues that *Moridge* supports its assertion. *See Moridge,* 451 N.E.2d 677. In *Moridge* we did not find a separate claim for breach of good faith. We found that the good faith provision of I.C. § 26–1–1–203 applied when there had been a breach of the distributorship agreement. *Id.* at 681. Here, Best did not assert any breach of a distributorship agreement (contract) in

its counterclaim. Best makes an independent claim for breach of a duty of good faith that cannot stand alone. In confirming the comment to I.C. § 26–1–1–203 and after reviewing other jurisdictions good faith provisions under the U.C.C., we hold that under the Indiana U.C.C. there is no claim for breach of a duty to deal in good faith independent from a breach of contract. *See* I.C. § 26–1–1–203 cmt. Therefore, as matter of law, Best's independent claim of breach of a duty of good faith under the Indiana U.C.C. must fail.

## IV. REASONABLENESS OF TERMINATION

■ The final issue is whether Seyfert's thirty day notice of its termination of the distributorship relationship with Best was reasonable. Best argues that the termination was unreasonable because it had not found a "substitute arrangement." We disagree.

■ "[T]he termination of a contract which contains no specific time for termination may be terminated by either party at will." *Monon R.R. v. New York Cent. R. Co.*, 141 Ind.App. 277, 287, 227 N.E.2d 450, 457 (1967). In *House of Crane, Inc. v. H. Fendrich, Inc*, we endorsed the Seventh Circuit's statement of Indiana law on termination of "at will" contracts. *House of Crane, Inc. v. H. Fendrich, Inc.*, 146 Ind.App. 478, 481–482, 256 N.E.2d 578, 579 (1970) (citing *Bell v. Speed Queen*, 407 F.2d 1022 (7th Cir.1969)). In *Bell*, the court held that a contract containing no termination date was terminable at will so there could be no action for breach of contract because the termination was lawful. *Bell*, 407 F.2d at 1026. Indiana's Uniform Commercial Code, I.C. § 26–1–2–309, provides:

"[a]bsence of specific time provisions; notice of termination

\* \* \* \*

(3) Termination of a contract by one (1) party, except on the happening of an agreed event, requires that *reasonable no-*

*tification* be received by the other party, and an agreement dispensing with notification is invalid if its operation would be unconscionable."
(emphasis added).

Comment 8 of I.C. § 26–1–2–309 also provides an explanation of "reasonable notification" by stating:

"[s]ubsection (3) recognizes that the application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party *reasonable time to seek a substitute arrangement. . . .*"
(emphasis added). Further, I.C. § 26–1–1–204(2) states that "reasonable time" is defined under the Indiana U.C.C. as: "[w]hat is a reasonable time for taking any action depends on the nature, purpose, and circumstances of such action." Contrary to Best's assertion that the focus should be on whether it secured a substitute agreement that was financially equivalent to the one it had with Seyfert, we find that the issue is simply whether a substitute agreement was established. *See* I.C. § 26–1–2–309, cmt.

Our research revealed no Indiana cases that define what time period is reasonable for termination of a "terminable at will" distributorship. Therefore, we look again to the Seventh Circuit. In *Communications Maintenance, Inc. v. Motorola, Inc*, the Seventh Circuit held that a thirty day notice of termination was reasonable and adequate, not unconscionable, when the contract between the parties required a thirty day notice of termination. *Communications Maintenance, Inc. v. Motorola, Inc*, 761 F.2d 1202, 1209–1210 (7th Cir.1985). In *Rockwell Engrg. Co. v. Automatic Timing & Controls*, a manufacturer and a representative originally entered a written contract that could be terminated by either party upon thirty days [17] written notice of termination. *Rockwell Engrg. Co. v. Automatic Timing & Controls*, 559 F.2d 460, 461 (7th Cir.1977). The written contract was subsequently terminated. *Id.* Under an oral understanding to last for an indefinite period, the parties continued their relation-

---

17. The termination letter was mailed on April 17, 1975, and was effective May 15, 1975, so actually twenty-eight days notice was given. *Rockwell*, 559 F.2d at 463.

ship for another three years until the manufacturer gave the representative thirty days written notice of termination. *Id.* The district court held that the termination was reasonable and the Seventh Circuit affirmed the district court's grant of summary judgment for the defendant. *Id.* at 461–462, 464. In doing so, the Seventh Circuit held that under I.C. § 26–1–2–309 the representative received reasonable notification of termination and, therefore, the Indiana Commercial Code was satisfied. *Id.* at 463.

In a more recent Seventh Circuit case, *Monarch Beverage, Co. v. Tyfield Importers, Inc.,* a supplier and a distributor had an oral agreement that was terminable at will by either party, with or without cause. *Monarch Beverage, Co. v. Tyfield Importers, Inc.,* 823 F.2d 1187, 1189 (7th Cir.1987). The supplier sent the distributor a letter terminating the relationship effective immediately. *Id.* The trial court found that the supplier breached its duty to give the distributor reasonable notice of its termination of the distributorship agreement and that reasonable notice would have been thirty days notice. *Id.* The supplier argued that finding thirty days notice was reasonable was not clearly erroneous. *Id.* at 1190. In addition, the supplier contended that the thirty days notice was reasonable because it was the industry practice and thirty days provided ample time for the supplier to contract for a substitute. *Id.* The Seventh Circuit stated that I.C. § 26–1–2–309 and its comment number eight applied to the distributorship agreement. *Id.* The Seventh Circuit found that the trial court's conclusion that thirty days notice was reasonable was a finding of fact subject to review under a clearly erroneous standard. *Id.* After reviewing the sufficiency of the evidence, the court found that thirty days provided the supplier with sufficient time to find a substitute agreement. *Id.* After considering the facts and circumstances underlying the distributorship agreement, the Seventh Circuit concluded that the trial court's finding that the supplier's thirty day notice of termination was reasonable was not clearly erroneous. *Id.* at 1191.

Here, we must determine as a matter of law whether Seyfert's thirty days notice of termination was reasonable. *See Monarch,* 823 F.2d at 1190. Seyfert's argues that its thirty day notice provided Best with a reasonable time to find a substitute supplier and directs us to designated evidence to support its argument. Seyfert points out that in April,[18] Sharp, Best's president, turned to Jay's to increase distribution of Jay's products to substitute for Seyfert's. Best had been distributing Jay's products since 1988. Seyfert points out that the thirty day notice was reasonable because Best's distribution of Jay's products increased by May of 1995, roughly thirty days after the termination notice. Seyfert argues that the thirty days notice was reasonable because it provided Best with adequate time to find, and Best did find, a substitute supplier.

 Best argues that the thirty day notice was unreasonable because it did not find a "substitute agreement." Best cites to designed evidence showing that since the relationship with Seyfert terminated it went from a net profit to a net loss. Best's citation to designated evidence that it had losses alone is not relevant to the determination of whether Seyfert provided Best with notice that allowed Best a reasonable time to find a substitute agreement. Because Best is not profitable in its distribution of Jay's products but was when it was distributing Seyfert's products does not mean that Best did not have a reasonable time to secure a substitute arrangement with Jay's. *See* I.C. § 26–1–2–309, cmt. We cannot say that a "reasonable time" means an indefinite period of time for Best to find an equally financially lucrative substitute. As we stated earlier, whether Best found an equally "financially lucrative substitute agreement" is not at issue here. Because Best found a substitute agreement, Seyfert's thirty day notice was reasonable. *See Monarch,* 823 F.2d at 1190.

Because we find that the trial court did not err in holding that Best did not pay an indirect franchise fee to Seyfert, no fiduciary duty existed between Best and Seyfert, Seyfert did not owe Best an independent duty of good faith under the Indiana U.C.C., and

**18.** Seyfert terminated the contract with Best on April 24.

that Seyfert's notice of termination to Best was reasonable we affirm the judgment of the trial court.

Affirmed.

HOFFMAN, Sr.J. concurs.

SULLIVAN, J. concurs in part and dissents in part with separate opinion.

SULLIVAN, Judge, concurring in part and dissenting in part

I respectfully disagree with the majority's conclusion that, as a matter of law, Seyfert did not "require" that Best acquire (whether by construction, purchase, lease, or otherwise) a warehouse. Under the facts, a trier of fact might very well reasonably conclude that Best had little or no choice but to honor Seyfert's wishes with regard to additional storage capacity. Such lack of choice could well constitute a "requirement" within the meaning of the definition of a franchise fee. Nevertheless, I agree that the cost of the warehouse is recoverable and was incurred in the ordinary course of business. For that reason, it is not a franchise fee.

Similarly, I believe that a reasonable trier of fact might conclude that by reason of the contractual obligations and benefits created between the parties a relationship equivalent to a fiduciary relationship existed so as to give rise to a duty of good faith and fair dealing between them. *See Union Miniere, S.A. v. Parday Corp.* (1988) Ind.App., 521 N.E.2d 700.

Be that as it may, it is only common sense to acknowledge as a sound legal principle that inherent in every contractual relationship is a duty upon the parties to act reasonably, fairly, and in good faith. *See* RE-STATEMENT SECOND OF CONTRACTS § 205 (1981) (providing that *"[e]very* contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement" (emphasis supplied)). As acknowledged by the majority, the UCC has adopted this principle. *See* I.C. 26–1–1–203 (Burns Code Ed. Repl.1992) (stating that "[e]very contract or duty within IC 26–1 imposes an obligation of good faith in its performance or enforcement"). Further-

more, because Seyfert may be considered a "merchant" under the Code, it was also required to observe "reasonable commercial standards of fair dealing in the trade." *See* I.C. 26–1–2–104 (Burns Code Ed. Repl.1992) (defining merchant as a "person who deals in goods of the kind"); I.C. 26–1–2–103 (Burns. Code Ed. Repl.1992 & Supp.1998) (defining " 'Good faith' in the case of a merchant" as "honesty in fact and observance of reasonable commercial standards of fair dealing in the trade").

Although I agree with the majority that Section 203 does not create an independent cause of action for breach of good faith, I cannot agree with the majority's assertion that "Best did not assert any breach of a distributorship agreement (contract) in its counterclaim." Slip op. at 19. In Count III of its counterclaim, Best alleged that prior to Seyfert's attempt to terminate the relationship, Seyfert engaged in several activities, including selling Seyfert's products to Best's customers, hiring Best's drivers to work in sales areas and contacting Best's existing customers and engaging in activities which caused Best to lose sales to these customers. Thus, Best's counterclaim is susceptible to proof that Seyfert, by engaging in these certain activities, failed to act in good faith and deal fairly.

I would remand to the trial court for a determination by the trier of fact as to whether a fiduciary relationship existed between Seyfert and Best and whether Seyfert, by engaging in certain activities, failed to deal fairly and in good faith in its contractual relationship with Best and if so, what damages, if any, were sustained by Best.

In all other respects, I concur in the affirmance of the partial summary judgment.